[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10343

_____

CLARISSA GILMORE,

Plaintiff-Appellant,

*versus*

GEORGIA DEPARTMENT OF CORRECTIONS,
an agency of the State of Georgia,
COMMISSIONER, GEORGIA DEPARTMENT OF
CORRECTIONS,
in his official capacity,
ALBERTA W. MILTON,
individually and in her official capacity,
SABRINI CARLENE LUPO,
individually and in her official capacity,
SMITH SP WARDEN,

2                    Opinion of the Court                    23-10343

in his official capacity as successor-in-interest, et al.,

Defendants-Appellees,

DOUGLAS M. WILLIAMS,
individually and in his official capacity,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 6:18-cv-00115-RSB-CLR

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN, ROSENBAUM, JILL
PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER,
ABUDU, KIDD, and TJOFLAT, Circuit Judges.

JORDAN, Circuit Judge, delivered the opinion of the Court in which
WILLIAM PRYOR, Chief Judge, and NEWSOM, BRANCH, GRANT,
LAGOA, BRASHER, ABUDU, and TJOFLAT, Circuit Judges, joined, and
in which LUCK, Circuit Judge, joined as to Parts II.C, III.B.2, and IV.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion in which
LAGOA and TJOFLAT, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a concurring opinion in which JILL
PRYOR and KIDD, Circuit Judges, joined.

TJOFLAT, Circuit Judge, filed a concurring opinion in which LAGOA and BRASHER, Circuit Judges, joined, and in which LUCK, Circuit Judge, joined as to Parts III, IV, and V.

JORDAN, Circuit Judge:

Clarissa Gilmore sued several Georgia correctional officers under 42 U.S.C. § 1983 for subjecting her to a strip search in February of 2017 when she visited her then-husband at Smith State Prison in Georgia. She alleged that the officers did not have any suspicion to conduct a strip search, that they coerced her consent by threatening her with detention, that they failed to give her the option to forgo her visit and leave the facility, and that the strip search involved physical touching of intimate body parts and a visual body-cavity inspection.

The district court granted summary judgment to the officers on qualified immunity grounds, and a panel of this court affirmed. The panel, viewing the evidence in the light most favorable to Ms. Gilmore, concluded that the officers violated the Fourth Amendment because they lacked reasonable suspicion for the strip search but agreed with the district court that the officers were entitled to qualified immunity because Supreme Court and Eleventh Circuit precedent did not clearly establish at the time of the strip search that reasonable suspicion was required. *See Gilmore v. Ga. Dept. of Corr.*, 111 F.4th 1118, 1130–36 (11th Cir. 2024).

Two members of the panel wrote separate concurrences. Judge Rosenbaum explained that our cases, contrary to Supreme Court precedent, failed to look to "a robust consensus of

persuasive authority" in determining whether the law was clearly established for qualified immunity purposes. And she suggested that the case be reheard en banc to conform our caselaw to the Supreme Court's teachings. *See id.* at 1136–38 (Rosenbaum, J., concurring). Judge Newsom generally agreed with Judge Rosenbaum's concern and wrote to set out some "oddities" in qualified immunity jurisprudence. *See id.* at 1138–41 (Newsom, J., concurring).

We voted to rehear the case as a full court, *see Gilmore v. Ga. Dept. of Corr.*, 119 F.4th 839 (11th Cir. 2024) (en banc), and asked the parties to brief two issues:

1.  Whether *Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc), and *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003), should be overruled to the extent that they hold or state that no amount of out-of-circuit authority can clearly establish the law for purposes of qualified immunity.

2.  If so, whether a "robust consensus of persuasive authority" clearly established that the strip search violated Ms. Gilmore's Fourth Amendment rights.

After hearing oral argument, we asked the parties to brief two additional issues:

3.  Whether a jury could find that the strip search violated the Fourth Amendment if it credits Ms. Gilmore's version of events.

4. If so, whether the Fourth Amendment violation was one of "obvious clarity" such that the officers are not entitled to qualified immunity.

We now answer the last two questions affirmatively.

First, if it credits the version of events presented by Ms. Gilmore, a jury could find under the totality of the circumstances that the officers who conducted the strip search violated her Fourth Amendment rights. The strip search was not justified at its inception because the officers (1) lacked even reasonable suspicion that Ms. Gilmore was involved in any illegal activity, (2) coerced her consent through a threat of detention, and (3) failed to give her the option to forgo her visit and leave the facility. The search was also unreasonable in scope because it involved the physical touching of intimate body parts and a visual body-cavity inspection.

Second, for all of the reasons summarized above, the Fourth Amendment violation was one of "obvious clarity." As a result, the officers who conducted the strip search are not entitled to qualified immunity at this stage of the litigation.

As for the first two questions, *Marsh* and *Thomas* do not hold that cases from our sister circuits cannot be considered in determining whether a constitutional violation was one of "obvious clarity" for purposes of qualified immunity. To the extent that language in *Marsh*, *Thomas*, and other Eleventh Circuit cases can be read to suggest that out-of-circuit authority is irrelevant in determining whether the law was clearly established, we now clarify that

such authority may indeed be considered in an "obvious clarity" scenario.

We leave for another day the broader questions of what constitutes a "robust consensus of persuasive authority" and whether such a consensus can alone constitute clearly established law in the absence of Supreme Court or Eleventh Circuit precedent.

## I

Many of the facts here are contested.  At the summary judgment stage, however, we resolve any conflicts in favor of Ms. Gilmore.  We do so not only to decide whether a jury could find in her favor on the Fourth Amendment claim, but also to determine whether the officers who conducted the strip search are entitled to qualified immunity.  *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  Viewed through this prism, here is the evidence in the light most favorable to Ms. Gilmore, taken from the panel opinion and the record.  *See Gilmore*, 111 F.4th at 1124–25.

## A

Twice a month, Ms. Gilmore visited her then-husband, Mulik Sheets, at Smith State Prison in Georgia.  On February 26, 2017, she arrived, as she had roughly fifty times before, and successfully proceeded through the initial security screening.  That meant undergoing three different types of searches: a pat-down search, a metal-detector wand search, and an electromagnetic-radiation/body-scan search.

23-10343               Opinion of the Court                    7

Smith State Prison did not have any signs warning visitors that they might be (or would be) subject to strip searches.  There was a sign posted outside the sallyport, but it only told visitors that by seeking to enter they "consent[ed]" to "a search of their person and property at any time," including "searches by the use of X-ray devices, metal detectors, body scanners, and pat down searches."

Once Ms. Gilmore cleared the initial security screening, correctional officers escorted her to a second building where the visitation room was located.  Officer Sabrini Lupo assigned Ms. Gilmore to a table, where Mr. Sheets joined her, and their visit began.  Officer Lupo and Lieutenant Alberta Milton remained present in the visitation room during the visit.

About thirty minutes into the visit, Ms. Gilmore noticed that Lieutenant Milton was staring at her.  Ms. Gilmore stared back for "one to two minutes."  In apparent response, Lieutenant Milton walked past Ms. Gilmore and returned to the front of the room, where she spoke to other officers.  Then Lieutenant Milton left the visitation room.

When Lieutenant Milton returned with Officer Christina Irizarry, she told Ms. Gilmore to go with her.  Lieutenant Milton and Officer Irizarry took Ms. Gilmore into the hallway and handed her a strip-search approval form.  That form was blank and lacked approval signatures from prison officials.  Ms. Gilmore asked why the officers were going to strip search her, but Lieutenant Milton refused to tell her.  Ms. Gilmore also asked Lieutenant Milton if she

could speak to her supervisor, but Lieutenant Milton responded that she was the officer in charge that day.

Lieutenant Milton and Officer Irizarry insisted that Ms. Gilmore sign the strip-search approval form. If she didn't, they said, she would be sent to jail and would be unable to visit her husband again. Not only that, Lieutenant Milton told Ms. Gilmore that the officers would "search [her] anyway." Ms. Gilmore "didn't feel like [she] had an option," so she signed the form.

After Ms. Gilmore signed the form, Lieutenant Milton and Officer Irizarry led her to an empty bathroom and instructed her to remove all of her clothes, including her bra and underwear. Ms. Gilmore complied. Officer Irizarry examined Ms. Gilmore's clothing for contraband but found nothing.

When Officer Irizarry finished, at Lieutenant Milton's direction, she conducted a manual search of Ms. Gilmore. Officer Irizarry first manipulated Ms. Gilmore's breasts, lifting each breast and looking underneath it. Lieutenant Milton then ordered Ms. Gilmore to "[t]urn around," "bend over," and "open [her] butt cheeks." Ms. Gilmore did as instructed, and Officer Irizarry "felt in between" Ms. Gilmore's buttocks with her gloved hand.

Lieutenant Milton and Officer Irizarry next instructed Ms. Gilmore to spread her vagina, which they visually inspected. Finding no contraband, they told Ms. Gilmore to put her clothes back on and allowed her to resume her visit.

Officer Irizarry led Ms. Gilmore back to the visitation room and told her that she was "so sorry." Ms. Gilmore stayed until

visitation ended, but she and Mr. Sheets barely spoke because she was upset and "tearing up." Ms. Gilmore left Smith State Prison and cried through her drive home.

## B

Two days later, Ms. Gilmore called Deputy Warden Tamarshe Smith to complain and ask why she had been strip-searched. Deputy Warden Smith seemed unaware of the incident. He told Ms. Gilmore that he would look into it and call her back. When Ms. Gilmore spoke to Deputy Warden Smith again, he apologized and "said that he did not see anything on the video" footage of the visitation room "that would warrant a strip search."

Officer Lupo testified that she smelled marijuana on Ms. Gilmore during her visit to Smith State Prison, and that she shared her observation with Lieutenant Milton. Officer Lupo also testified that she found it suspicious that Ms. Gilmore was staring at her and Lieutenant Milton. But the witness statements of Lieutenant Milton and Officer Irizarry, recorded on the day of the incident, did not mention any marijuana odor or suspicious eye contact. Nor did the strip-search approval form, which stated only that Ms. Gilmore was "[u]nder suspicion for carrying contraband."

Lieutenant Milton testified that she called Deputy Warden Smith before conducting the strip search, and he gave her verbal approval. But Lieutenant Milton's contemporaneous statement contains no reference to any such call. And duty records show that Deputy Warden Smith was not working the day of the search. For summary judgment purposes, then, a reasonable inference is that

Lieutenant Milton did not obtain verbal approval from Deputy Warden Smith for the strip search.[1]

For her part, Ms. Gilmore denied consuming, possessing, or smelling like marijuana at any point before or during her visit.  She also denied staring at Officer Lupo in the visitation room, and only stared back at Lieutenant Milton in response to the latter's initial staring.

## II

Our discussion relates only to the Fourth Amendment claims against Lieutenant Milton and Officer Irizarry, who conducted the strip search of Ms. Gilmore.  We first address whether a jury could find that the strip search violated the Fourth Amendment.[2]

## A

The Fourth Amendment, as relevant here, provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  It applies to the states through

---

[1] The regulations of the Georgia Department of Corrections provide that "[n]o strip search shall be conducted until the Strip Search Approval Form . . . is signed by one of the following designees: . . . Warden or Deputy Warden . . . Administrative Duty Officer or the Officer in Charge with verbal approval of the Administrative Duty Officer."

[2] We recognize that Ms. Gilmore also asserted a Fourth Amendment claim against Officer Lupo on a § 1983 conspiracy theory.  We do not address that claim and leave it for the panel.

23-10343               Opinion of the Court                    11

the Due Process Clause of the Fourteenth Amendment. *See, e.g., City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It is undisputed that the non-consensual strip search of Ms. Gilmore, which included both physical touching of intimate body parts and a visual body-cavity inspection, was both a search and a seizure under the Fourth Amendment. *See Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 325 (2012) (upholding, as reasonable under the Fourth Amendment, a county jail's policy requiring that all arrestees be strip-searched before being admitted to general population); *Torres v. Madrid*, 592 U.S. 306, 317 (2021) (explaining that the "appropriate inquiry" for determining whether there has been a Fourth Amendment seizure "is whether the challenged conduct *objectively* manifests an intent to restrain") (emphasis in original).

As a general matter, Fourth Amendment reasonableness takes into account the totality of the circumstances. *See, e.g., County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (use of force); *Samson v. California*, 547 U.S. 843, 848 (2006) (search); *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (seizure). The Supreme Court has applied that same holistic approach to strip searches in the school context, and so have we. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009) (analyzing the strip search of a teenage student at a middle school); *T.R. by and through Brock v. Lamar Cnty. Bd. of Ed.*, 25 F.4th 877, 883 (11th Cir. 2022) (same). We therefore consider the totality of the circumstances in evaluating the reasonableness of Ms. Gilmore's strip search.

"[W]hat is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985). In the prison context, the Supreme Court has explained that the "test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 528, 559 (1979) (upholding a detention center policy which required all pretrial detainees to "expose their body cavities for inspection following contact visits").

"Determining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the . . . action was justified at its inception[;]' second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place[.]'" *T.L.O.*, 469 U.S. at 341 (citations omitted). We discuss these two matters below.

**B**

The "amount of suspicion required to justify a particular search depends on the intrusiveness of that search." *United States v. Pino*, 729 F.2d 1357, 1359 (11th Cir. 1984). The Supreme Court has not addressed the level of suspicion necessary for a strip search of a prison visitor. And prior to the panel's decision, *see Gilmore*,

111 F.4th at 1128, nor had we.  But the nine circuits to have faced the issue have all held that such a search requires reasonable suspicion.  *See Wood v. Clemons*, 89 F.3d 922, 928–29 (1st Cir. 1996); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997); *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir. 1991); *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Cates v. Stroud*, 976 F.3d 972, 985 (9th Cir. 2020); *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995).

The strip search at issue here involved both the physical touching of intimate body parts (the breasts and the buttocks) and a visual body-cavity inspection.  We need not definitively decide whether this type of strip search requires reasonable suspicion or probable cause.  But for the following reasons we conclude that, at the very least, correctional officers must have reasonable suspicion that a visitor is concealing contraband (e.g., drugs or weapons) before they subject her to a strip search.

A visitor who seeks admission to a prison has a diminished expectation of privacy and can expect to have her person and property searched because contact visits can "open the institution to the introduction of drugs, weapons, and other contraband," *Block v. Rutherford*, 468 U.S. 576, 586 (1984), but she is not in the same position as an incarcerated detainee or inmate for purposes of the Fourth Amendment.  As the panel correctly put it, "a free person visiting a prison is in a different position for Fourth Amendment

purposes than a prisoner or detainee." *Gilmore*, 111 F.4th at 1130. *See also T.L.O.*, 469 U.S. at 338 (stating that civilians and prisoners "stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration") (quoting *Ingraham v. Wright*, 430 U.S. 651, 669 (1977)); *Blackburn v. Snow*, 771 F.2d 556, 563 (1st Cir. 1985) ("[T]hose visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy. But neither may they constitutionally be made to suffer a wholesale loss of rights—nor even one commensurate with that suffered by inmates.").

We reject the broad contention of Lieutenant Milton and Officer Irizarry that, for purposes of determining the Fourth Amendment reasonableness of a strip search, a prison visitor's status is irrelevant. *See* Appellees' Supp. Br. at 7–9. A visitor's status may not be determinative, but the claim that the prison setting is the only thing that matters—regardless of the type of search that is conducted—is a constitutional bridge too far. Such a bright-line rule goes against the balancing that the Supreme Court has called for in the prison context. *See Bell*, 441 U.S. at 559. *Accord Scott v. Harris*, 550 U.S. 372, 383 (2007) ("Although respondent's attempt to craft an easy-to-apply legal test in the Fourth Amendment context is admirable, in the end we must still slosh our way through the factbound morass of 'reasonableness.'").

The one prison visitor/strip search case that Lieutenant Milton and Officer Irizarry cite in support of their argument, *State v. Martinez*, 580 P.2d 1282 (Haw. 1978), is distinguishable on an

important point.  In *Martinez* the visitor had been strip-searched before "on several previous visits" to the prison.  *See id.* at 1284. Based on these prior experiences, the Hawaii Supreme Court concluded that the visitor's "consent to her search [wa]s . . . established in the present case, and the reasonableness of the search [had to] be judged in the light of that circumstance." *Id.* at 1286.  Here there is no evidence whatsoever that Ms. Gilmore had been strip-searched on any of her approximately fifty prior visits to Smith State Prison.  Nor is there any evidence that posted signs warned visitors that they might (or would be) subject to a strip search.  *Martinez* simply cannot bear the jurisprudential weight that Lieutenant Milton and Officer Irizarry seek to place on it.[3]

There is "no authority for the proposition that strip searches of prison visitors are per se reasonable." *Thorne*, 765 F.2d at 1276. In the words of a leading Fourth Amendment treatise, "a rule

---

[3] Because, as explained later, any consent by Ms. Gilmore was coerced, we express no view on whether *Martinez* was correctly decided.  We note, however, that the Fifth Circuit has rejected the *Martinez* consent rationale in the prison visitor/strip search context.  *See Thorne*, 765 F.2d at 1276 ("LSP next argues that the trial court erred in finding Mr. Thorne's [strip] search unreasonable under the [F]ourth [A]mendment, either because Mr. Thorne consented to his search or because he waived his [F]ourth [A]mendment rights when he entered the prison.  LSP locates this consent or waiver in the visitor form signed by Mr. Thorne and in the warning notices posted at the prison gates.  If accepted, this argument would render reasonable a strip search of any such prison visitor; as discussed above, such at-will, random searches are not reasonable under the Fourth Amendment.  The argument must therefore fail.").

requiring *all* prison visitors to submit to a body cavity strip search, without *any* predicate requirement of individualized suspicion or showing of special and highly unusual institutional need, cannot satisfy the Fourth Amendment." 5 Wayne R. La Fave, Search and Seizure: A Treatise on the Fourth Amendment § 10.7(b) (6th ed. & Nov. 2024 update) (quoting *Blackburn*, 771 F.2d at 562). *Accord* 2 Michael B. Mushlin, Rights of Prisoners § 9:21 (5th ed. & Nov. 2024 update) ("[R]outine strip searches of visitors are unconstitutional.").

This should not be surprising, for a strip search is not a routine or minimally intrusive means of maintaining prison security with respect to visitors. As we have explained, "a strip search represents a serious intrusion upon personal rights[;]" it is "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, [and] repulsive, signifying degradation and submission." *Justice v. Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992) (internal quotation marks and citation omitted). *See also Redding*, 557 U.S. at 374–75 ("embarrassing, frightening, and humiliating"). And that intrusion is magnified when—as here—there is "physical contact between the searcher and the person searched" and/or there is "exposure of intimate body parts[.]" *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018) (internal quotation marks and citation omitted).

We hold, therefore, that Lieutenant Milton and Officer Irizarry needed at least reasonable suspicion to subject Ms. Gilmore

to a strip search. And if they lacked reasonable suspicion, they necessarily lacked probable cause, which is a higher standard.

## C

Considering the totality of the circumstances, and viewing the evidence in the light most favorable to Ms. Gilmore, the strip search conducted by Lieutenant Milton and Officer Irizarry violated the Fourth Amendment at its inception. There was no suspicion whatsoever, the consent was coerced, there was no option to refuse consent and leave the facility, and the strip search was unreasonable in scope.

**No suspicion**. The "concept of reasonable suspicion is somewhat abstract," and the Supreme Court has resisted efforts to reduce it to a "neat set of legal rules." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal quotation marks and citations omitted). Nevertheless, reasonable suspicion is concerned with probabilities, and "[t]he officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (internal quotation marks and citation omitted).

Lieutenant Milton and Officer Irizarry did not have any suspicion for the strip search. Ms. Gilmore had successfully cleared an initial security screening that consisted of a pat-down search, a metal-detector wand search, and an electromagnetic-radiation/body-scan search. She testified that she did not stare at Officer Lupo when she was in the visitation room, that she stared back at Lieutenant Milton only after the latter stared at her first, and that

she did not smell of marijuana. There was no reasonable suspicion, and certainly no probable cause, for a strip search.

**Coerced consent**. Lieutenant Milton and Officer Irizarry coerced Ms. Gilmore's consent. They told her that if she did not sign the strip-search approval form, she would be taken into custody and would be strip-searched anyway. It has long been the law that the "Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). And "a search conducted pursuant to a coerced consent is not valid because the consenting party is forced to allow the search." *United States v. Rackley*, 742 F.2d 1266, 1271 (11th Cir. 1984).

**No option to leave**. A fair inference from the record is that Lieutenant Milton and Officer Irizarry—by telling Ms. Gilmore that she would be detained and would be strip-searched anyway—did not give her the option to forgo her visit, leave Smith State Prison, and avoid the strip search. The Sixth, Seventh, and Ninth Circuits have held that a prison visitor cannot be forced to undergo a strip search if she wants to leave the facility, and we agree with them. *See Spear v. Sowders*, 71 F.3d 626, 632 (6th Cir. 1995) (en banc) ("While a person may consent to less invasive searches merely by entering the facility, we do not think that a person consents to a strip and body cavity search by simply appearing at a visiting center. Instead, the same logic that dictates that such a search may be conducted only when there is reasonable suspicion also demands that the person to be subjected to such an invasive search be given the

opportunity to depart."); *Burgess*, 201 F.3d at 947 (agreeing with *Spear* and explaining that "a general conditioning of prison visitation on subjection to a strip search is manifestly unreasonable"); *Cates*, 976 F.3d at 984 ("Even if there was reasonable suspicion that Cates was seeking to bring drugs into the prison (a question we do not reach), [the officer] violated her rights under the Fourth Amendment by subjecting her to a strip search without giving her the option of leaving the prison rather than being subjected to the search."). *Accord Blackburn*, 771 F.2d at 568 (conditioning access to jail "upon sacrifice of [the] right to be free of an otherwise unreasonable strip search" is "constitutionally intolerable"). [4]

**Unreasonable Scope**. The strip search was, moreover, unreasonable in scope. This was not a strip search *simpliciter*, i.e., one which merely consists of the person's "clothes [being] removed." *Search*, Black's Law Dictionary 1623 (12th ed. 2024). It was, instead, constitutionally more intrusive in two significant ways.

The strip search involved the physical touching of intimate body parts. Officer Irizarry lifted Ms. Gilmore's breasts to look underneath them and felt in between Ms. Gilmore's buttocks with her

---

[4] As noted, the sign posted outside the sallyport did not provide visitors any warning that they could be (or would be) subject to suspicionless strip searches. As a result, there can be no argument that Ms. Gilmore's entry constituted implied consent to a strip search. *Cf. United States v. Sihler*, 562 F.2d 349, 350–51 (5th Cir. 1977) (holding that a prison employee consented to a search of his lunch bag upon entering the institution for work because a posted sign warned that "all persons entering upon these confines are subject to routine searches of their person, property or packages").

gloved hand.  A "[p]hysically invasive inspection is simply more intrusive than [a] purely visual inspection."  *Bond v. United States*, 529 U.S. 334, 337 (2000) (discussing the physical manipulation of a passenger's carry-on bag).  And where there is physical touching like there was here, a "greater amount of suspicion is necessary."  *Pino*, 729 F.2d at 1359.  *See also Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001) ("Public exposure of the genitalia accompanied by physical touching is far more intrusive than directing an arrestee to remove her clothing in private for the purpose of 'visually inspecting' the arrestee's genitalia.").

In addition, the strip search involved a visual body-cavity inspection which required Ms. Gilmore to bend over and spread her vagina.  Needless to say, this exposition of an intimate area was more invasive and implicated even greater privacy concerns: "[V]isual body cavity searches are even more intrusive [than strip searches].  They require a [person] not only to strip naked in front of a stranger, but also to expose the most private areas of her body to others. This is often, as here, done while the person . . . is required to assume degrading and humiliating positions."  *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (internal quotation marks and citation omitted).  *See generally* William E. Ringel, Searches and Seizures, Arrests, and Confessions § 16:20 (2d ed. & March 2025 update) ("When more intrusive strip searches are involved . . . the governmental interests must be more closely scrutinized.").

### III

The remaining question is whether Lieutenant Milton and Officer Irizarry are entitled to qualified immunity. "Qualified immunity attaches when an offic[er's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (internal quotation marks and citation omitted).

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *T.R.*, 25 F.4th at 883 (internal quotation marks and citation omitted). Under the third method, "a general constitutional rule . . . may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks and citation omitted) (denying qualified immunity to prison guards who tied a shirtless inmate to a hitching post in the hot sun for approximately seven hours, gave him water only once or twice, and denied him any bathroom breaks).

We conclude that the strip search here, considering all the circumstances, was so clearly prohibited that a reasonable officer would have known of its unconstitutionality in February of 2017. The Fourth Amendment violation was, in other words, one of "obvious clarity."

### A

Before returning to the record, which we view in the light most favorable to Ms. Gilmore, we consider a recent qualified immunity case in which the Supreme Court found that a constitutional violation was of "obvious clarity" despite the lack of cases with similar facts.

In *Taylor v. Riojas*, 592 U.S. 7 (2020), a state inmate, Taylor, asserted an Eighth Amendment claim against several correctional officers. In his verified complaint, he alleged that he did not eat or drink for nearly four days while he was housed in a cell that was "covered, nearly floor to ceiling, in massive amounts of feces: all over the floor, the ceiling, the window, the walls, and even packed inside the water faucet." *Id.* at 7–8 (internal quotation marks and citation omitted). He also alleged that he was moved to a "frigidly cold cell, which was equipped with only a clogged drain in the floor to dispose of bodily wastes," and that he "held his bladder for over 24 hours, but he eventually (and involuntarily) relieved himself, causing the drain to overflow and raw sewage to spill across the floor." *Id.* at 8. "Because the cell lacked a bunk, and because Taylor was confined without clothing, he was left to sleep naked in sewage." *Id.*

The Fifth Circuit affirmed the district court's grant of summary judgment in favor of the officers on qualified immunity grounds. Although it held that the conditions alleged by Taylor violated the Eighth Amendment, the Fifth Circuit concluded that the law was not clearly established that placing an inmate in cells "teeming with human waste" for "only six days" was unconstitutional, and as a result the officers lacked "fair warning." *See id.* at 8 (quoting *Taylor v. Stevens*, 946 F.3d 211, 222 (5th Cir. 2019)).

In a short opinion, the Supreme Court summarily reversed the Fifth Circuit's qualified immunity ruling and explained, citing to *Hope*, that a general constitutional rule identified in the caselaw could apply with "obvious clarity" to conduct lacking an exact factual parallel. *See id.* at 8–9. Here is how the Court explained its decision:

> [N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time. The Fifth Circuit identified no evidence that the conditions of Taylor's confinement were compelled by necessity or exigency. Nor does the summary-judgment record reveal any reason to suspect that the conditions of Taylor's confinement could not have been mitigated, either in degree or duration. And although an officer-by-officer analysis will be necessary on remand, the record suggests that at least some officers involved in Taylor's ordeal were deliberately indifferent to the conditions

of his cells.  Confronted with the particularly egregious facts of this case, any reasonable officer should have realized that Taylor's conditions of confinement offended the Constitution.

*Id.* (citations omitted and paragraph structure altered).

## B

Here, considering all of the circumstances described below, the unconstitutionality of Ms. Gilmore's strip search was of "obvious clarity."  In other words, a reasonable officer in February of 2017 would have had fair notice that the strip search violated the Fourth Amendment at its inception and in its scope.

Before examining the relevant circumstances, we explain that we can consider persuasive out-of-circuit authority to determine whether a violation was of "obvious clarity."

## 1

The Supreme Court has said on numerous occasions that the decisions of other circuits are a relevant consideration in determining whether the law is clearly established.  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be 'settled law,' which means it is dictated by 'controlling authority' or '*a robust consensus of cases of persuasive authority*[.]'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citations omitted and emphasis added).  *Accord Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

23-10343                Opinion of the Court                25

Our decisions in *Marsh* and *Thomas*—which predate all of the Supreme Court cases cited above except for *Wilson*—contain language suggesting that out-of-circuit authority should not be considered in determining whether a right was clearly established. The language in *Marsh*, an en banc decision, was limited to the first method of determining clearly established law, a method which is based on prior cases that are on point. *See Marsh*, 268 F.3d at 1032 n.10 ("When case law is needed to 'clearly establish' the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state."). The language in *Thomas*, however, was looser and potentially broader:

> Plaintiffs insist that "consensus or persuasive authority" from other circuits may create clearly established law. Plaintiffs then direct us to six opinions from other circuits that deal with strip searches. As we have stated, only Supreme Court cases, Eleventh Circuit caselaw, and Georgia Supreme Court caselaw can "clearly establish" law in this circuit. In *Marsh* . . . we implicitly reaffirmed that position when we stated that we do not understand [*Wilson v. Layne*, 526 U.S. 603 (1999)] to have held that a consensus of cases of persuasive authority would be able to establish law clearly."

*Thomas*, 323 F.3d at 955 (citations and footnote omitted). Despite the language they contain, *Marsh* and *Thomas* do not hold, and should not be read to suggest, that cases from our sister circuits

cannot be considered in determining whether a constitutional violation was one of "obvious clarity" for purposes of qualified immunity.

In fact, at least one of our cases points in the opposite direction. In *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991), which concerned an Eighth Amendment/deliberate indifference claim involving prison conditions, we relied in part on decisions issued by our sister circuits in determining both (1) that the plaintiff had presented sufficient evidence to withstand summary judgment *and* (2) that the correctional officers who had been sued were not entitled to qualified immunity. The inmate in *Baird* had testified that he had been detained in a "cold cell [with the temperature at 60 degrees] with no clothes except undershorts and with a plastic-covered mattress without bedding; [there was] filth on the cell's floor and walls; [he was] depriv[ed] of toilet paper for three days; [he was] depriv[ed] of running water for two days; [there was a] lack of soap, toothbrush, toothpaste, and linen; and . . . the cell [had previously been occupied] by an inmate afflicted with an HIV virus." *Id.* at 1063. He explained that he "slept on the floor [of his cell] and on occasion huddled with a roommate, sleeping between two mattresses." *Id.*

In reversing the district court's grant of summary judgment in favor of the officers, we noted in part that "[o]ther circuits ha[d] for some time recognized the temperature factor in assessing conditions of confinement." *Id.* at 1064. Citing and discussing cases from the Second, Fourth, Seventh, Eighth, and Tenth Circuits, we

held that the evidence, viewed in the light most favorable to the plaintiff, allowed a jury to find an Eighth Amendment violation: "We conclude from this body of caselaw that plaintiff is entitled to have the trier of fact determine whether the conditions of his administrative confinement, principally with regard to the cell temperature and the provision of hygiene items, violated the minimal standards required by the Eighth Amendment." *Id.* at 1065. We then held, without further explanation, that the officers were not entitled to qualified immunity: "We also conclude, although the district court did not reach the issue, that the right of a prisoner not to be confined in a cell at so low a temperature as to cause severe discomfort and in conditions lacking basic sanitation was well established in 1986. The defendants therefore were not entitled to summary judgment on the basis of qualified immunity." *Id.* at 1065–66.

*Baird* supports our view that reliance on out-of-circuit authorities is permitted in determining whether a violation was of "obvious clarity." We have explained that the *Baird* panel, "in rendering its judgment on qualified immunity, was concerned entirely with the law related to excessive cold claims," *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004), and the cases cited in *Baird* involving cold prison cells came from other circuits.

Nevertheless, we recognize that some of our post-*Marsh*/post-*Thomas* cases can be read to say (or suggest) that out-of-circuit authority is not relevant under *any* of the three methods

for determining whether a right was clearly established. We discuss two such cases as examples.

In *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), a Fourth Amendment excessive force case, we indicated that under each of the three methods of determining whether a right was clearly established, out-of-circuit cases cannot be considered:

> Mercado can demonstrate that his right was clearly established in a number of ways. First, he can show that a materially similar case has already been decided, giving notice to the police. He could also show that a broader, clearly established principle should control the novel facts in this situation. Finally, he could show that this case fits within the exception of conduct which so obviously violates [the] constitution that prior case law is unnecessary. *To make this showing, Mercado must point to law as interpreted by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Florida.*

*Id*. at 1158–59 (citations omitted and emphasis added). On its face, this language from *Mercado* could be construed to preclude consideration of cases from other circuits under any of the methods for determining clearly established law, including the "obvious clarity" formulation. This is because the highlighted text seems to apply to all three ways of demonstrating clearly established law.

*Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012), which also involved a Fourth Amendment excessive force claim, contains similar language. In that case, we held that the officer's use of deadly force

was reasonable, *see id.* at 1252–55, but then chose to also address the issue of qualified immunity.  After setting out the three ways of showing that a right was clearly established—including that a violation was of "obvious clarity"—we made the following general statement: "Under controlling law, the plaintiffs must carry their burden [as to clearly established law] by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court." *Id.* at 1255.  And after analyzing the three methods—again including the "obvious clarity" formulation—we concluded with this language: "In short, the clearly established law as interpreted by the United States Supreme Court, this Court, and the Florida Supreme Court would not have given [the officer] fair notice that his actions would violate the Fourth Amendment." *Id.* at 1258.  Because these two passages in *Terrell* are linked to all three ways of demonstrating clearly established law, they can be read as precluding consideration of persuasive out-of-circuit authority in assessing whether a violation was one of "obvious clarity."[5]

---

[5] *Mercado* and *Terrell* are not the only Eleventh Circuit decisions after *Marsh* and *Thomas* to this effect.  *See, e.g., Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) ("[O]nly decisions of the United States Supreme Court, this Court, or the highest court in a state can 'clearly establish' the law."); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1206 (11th Cir. 2012) ("Clark-Moore, as a Florida official performing a discretionary duty, cannot be held to a standard of conduct which is unsettled by the Supreme Court[,] . . . this Circuit[,] or the highest state court in Florida.") (internal quotation marks and citation omitted); *Kelly v. Curtis*, 21 F.3d 1544, 1551 n.6 (11th Cir. 1994) ("By distinguishing those two out-of-circuit decisions that Kelly has cited, we do not mean to imply that the

30                    Opinion of the Court                    23-10343

Not surprisingly, some district courts in the Eleventh Circuit have interpreted our precedent to bar consideration of out-of-circuit authority in determining clearly established law.  And they are not alone; a number of civil rights treatises have read our cases the same way.  *See, e.g., Stafford v. City of Argo*, 514 F. Supp. 3d 1353, 1363 (N.D. Ala. 2021) ("[T]he Supreme Court has stated that in the absence of controlling authority, a robust consensus of persuasive authority may provide fair and clear notice particular conduct violates the Constitution. . . . However, the Eleventh Circuit repeatedly has instructed district courts within its bounds that only decisions issued by the United States Supreme Court, the Eleventh Circuit itself, and the highest court of the relevant state may [be considered].") (citations and internal quotation marks omitted); *Jackson v. McCurry*, 303 F. Supp. 3d 1367, 1375 n.5 (M.D. Ga. 2017) (explaining that, based on Eleventh Circuit precedent, "the Court does not address the cases from other circuits and district courts that Plaintiffs submitted to carry their burden of showing that Defendants violated clearly established law"), *aff'd*, 762 F. App'x 919, 925–26 (11th Cir. 2019) ("A plaintiff may 'demonstrate that the contours of the right were clearly established in one of three ways.'  First, a plaintiff may establish that 'a materially similar case has already been decided.'    Second, the plaintiff may 'point to a broader, clearly

_____

law can be clearly established for qualified immunity purposes by non-binding precedent."); *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009) ("In this Circuit, only the caselaw of the Supreme Court, the Eleventh Circuit or the law of the highest court of the state where the events took place—in this case, Florida—can 'clearly establish' constitutional rights.").

established principle that should control the novel facts of the situation.' Third, 'the conduct involved in the case may so obviously violate the [C]onstitution that prior case law is unnecessary.' The precedents that clearly establish law for these purposes are those of the Supreme Court, this Court, and the highest court of the state where the challenged action occurred.") (citations omitted); 2 Ivan E. Bodensteiner & Rosalie Berger Levinson, State and Local Government Civil Rights Liability § 2:8 (May 2024 update) ("The Eleventh Circuit . . . will not consider case law from other circuits in deciding whether the law was clearly established."); 2 Sheldon H. Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 8:22 n.2 (Sept. 2024 update) (citing Eleventh Circuit cases standing for the proposition that only decisions from the United States Supreme Court, the Eleventh Circuit, and the supreme court of the state in question can clearly establish law for purposes of qualified immunity); Michael Avery et al., Police Misconduct: Law and Litigation § 3.9 n.22 (Dec. 2024 update) (citing an Eleventh Circuit case for the same proposition).

Cases like *Mercado* and *Terrell* are not, of course, the sum and substance of our qualified immunity law. Indeed, in some cases we have explained that a plaintiff can make an "obvious clarity" showing when there are no similar decisions from the Supreme Court, the Eleventh Circuit, or the relevant state supreme court, thereby indicating that the "obvious clarity" analysis is not limited to these three buckets of caselaw. *See, e.g., Dukes v. Eaton*, 852 F.3d 1035, 1043 (11th Cir. 2017) ("Because no precedent of the Supreme Court, our Circuit, or the Supreme Court of Georgia has addressed the

constitutionality of flashbangs, Dukes must establish that 'a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity' to Deaton's conduct.") (citation omitted).

We therefore take this opportunity to clarify an aspect of our qualified immunity jurisprudence. Notwithstanding language in cases like *Marsh*, *Thomas*, *Mercado*, and *Terrell*, persuasive decisions from other circuits can be considered in determining whether a violation was one of "obvious clarity" for purposes of qualified immunity.[6]

To those who might suggest that considering the decisions of sister circuits in an "obvious clarity" scenario is practically meaningless—because it does not take published caselaw to make certain constitutional violations "obvious"—we point out that it is not always obvious that a violation was one of "obvious clarity." *See, e.g., Corbitt v. Vickers*, 929 F.3d 1304, 1321–23, 1324–26 (11th Cir. 2019) (2-1 decision disagreeing about whether a Fourth Amendment violation was one of "obvious clarity"); *Coffin v. Brandau*, 642 F.3d 999, 1014–18, 1027, 1029–30 (11th Cir. 2011) (en banc) (8-4 decision disagreeing about the same issue). In such cases persuasive authority

---

[6] Again, we leave for another day what constitutes a "robust consensus of persuasive authority" and whether such a consensus can by itself create clearly established law under the other two methods in the absence of Supreme Court or Eleventh Circuit precedent.

23-10343                  Opinion of the Court                      33

from other circuits may prove helpful in determining whether qualified immunity applies.

**2**

"[T]he salient question" for us is "whether the state of the law in [February of 2017] gave [Lieutenant Milton and Officer Irizarry] fair warning that their alleged treatment of [Ms. Gilmore] was unconstitutional." *Hope*, 536 U.S. at 741. Given all of the circumstances set out below, we answer that question affirmatively: the Fourth Amendment violation here, if Ms. Gilmore's version of events is credited, was one of "obvious clarity."

First, at the time of the conduct at issue here the seven circuits that had confronted the issue (the First, Second, Fifth, Sixth, Seventh, Eighth, and Tenth Circuits) had all held that a strip search of a prison visitor must be supported by reasonable suspicion. *See Wood*, 89 F.3d at 928–29; *Varrone*, 123 F.3d at 79; *Thorne*, 765 F.2d at 1276; *Daugherty*, 935 F.2d at 787; *Burgess*, 201 F.3d at 945; *Hunter*, 672 F.2d at 674; *Romo*, 46 F.3d at 1020. The unanimous view of a majority of the regional circuits on the minimum level of suspicion needed for a strip search is a relevant and important consideration in the "obvious clarity" analysis.

Lieutenant Milton and Officer Irizarry did not have reasonable suspicion, much less probable cause, for a strip search. Ms. Gilmore, who had successfully cleared a security screening which involved three different types of searches, did not stare at Officer Lupo while in the visitation room, stared back at Lieutenant Milton only in response, and did not smell of marijuana.

Second, Lieutenant Milton and Officer Irizarry coerced Ms. Gilmore to consent to the strip search by threatening her with detention. Again, "a search conducted pursuant to a coerced consent is not valid because the consenting party is forced to allow the search." *Rackley*, 742 F.2d at 1271. And by telling Ms. Gilmore that she would be strip-searched anyway, Lieutenant Milton and Officer Irizarry did not give her the option to forgo her visit and leave.

Third, Lieutenant Milton did not obtain verbal approval for the strip search from Deputy Warden Smith as required by the regulations of the Georgia Department of Corrections. This fact also weighs in favor of an "obvious clarity" violation. *See Hope*, 536 U.S. at 744 (considering, as a factor in the "fair notice"/qualified immunity analysis, the correctional officers' failure to comply with an Alabama Department of Corrections regulation that required a log whenever a hitching post was used: "A course of conduct that tends to prove that the requirement was merely a sham, or that respondents could ignore it with impunity, provides equally strong support for the conclusion that they were fully aware of the wrongful character of their conduct.").

Fourth, the strip search was clearly (i.e., obviously) unreasonable in scope. Lieutenant Milton and Officer Irizarry did not just require Ms. Gilmore to take off her clothes. At Lieutenant Milton's direction, Officer Irizarry lifted Ms. Gilmore breasts and felt in between her buttocks with her gloved hand. Following this physical touching of intimate body parts, Ms. Gilmore was subjected to a visual body-cavity search for which she had to bend over and

spread her vagina. These more intrusive aspects implicated additional privacy concerns and required a "greater amount of suspicion." *Pino*, 729 F.2d at 1359. *Cf. D.H. by Dawson v. Clayton Cnty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016) (denying qualified immunity to an assistant principal who strip-searched a 14-year old student in front of other school officials and some of his peers: "Viewing all reasonable inferences in favor of D.H. [the student], we conclude that a reasonable official in [Assistant Principal] McDowell's position would not have believed that requiring D.H. to strip down to his fully naked body in front of several of his peers was lawful in light of the clearly established principle that a student strip search, even if justified in its inception, must be 'reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'") (quoting *Redding*, 557 U.S. at 386).

To recap, based on all the circumstances, the unreasonableness of Ms. Gilmore's strip search under the Fourth Amendment (at its inception and in its scope) would have been obvious to any reasonable correctional officer in February of 2017. There was no suspicion whatsoever; the consent was coerced; there was no option to leave; the strip search was not administratively approved; and the strip search involved physical touching of intimate areas and a visual body-cavity inspection. A reasonable officer would have had clear notice that the search was obviously unconstitutional.

## IV

We reverse the district court's grant of summary judgment to Lieutenant Milton and Officer Irizarry on qualified immunity grounds and remand the case to the panel for further proceedings.

**REVERSED AND REMANDED.**

23-10343          WILLIAM PRYOR, C.J., Concurring          1

WILLIAM PRYOR, Chief Judge, joined by LAGOA and TJOFLAT, Circuit Judges, concurring:

Our foremost job is to decide appeals correctly. En banc rehearing facilitates this task by allowing us to consider each appeal anew from every angle. Starting over may also clarify what *must* be decided instead of what *may* be decided.

Here, our review with fresh eyes worked as intended. It turned a difficult question—whether and how to adopt Supreme Court dicta about a "robust consensus of cases of persuasive authority"—into a simple one—whether the alleged constitutional violation is one of obvious clarity. And the majority opinion answers that simple question correctly.

Our concurring colleague nevertheless would have us answer the difficult question. *See* Rosenbaum Concurring Op. at 1. She does not deny that the majority opinion decides the simple question correctly. But in her eagerness to confront what may, but not must, be decided, she overlooks a problem—besides those raised by Judge Tjoflat, *see* Tjoflat Concurring Op. at 20–29—with holding that a "robust consensus" of persuasive authority alone can clearly establish the law. That is, the so-called "robust consensus" might be wrong.

*Powell v. Barrett* provides an example of this problem. 541 F.3d 1298 (11th Cir. 2008) (en banc). There, we held that jail officers may strip-search arrestees without reasonable suspicion before placing them in a general population of detainees. *Id.* at 1300, 1314. And we reached that holding despite the unanimous disagreement

2              WILLIAM PRYOR, C.J., Concurring          23-10343

of our sister circuits. *Id.* at 1314–16 (Barkett, J., dissenting) (citing nine sister circuits holding that reasonable suspicion was required before guards could strip-search an arrestee). Later, the Supreme Court adopted *our* view, not the consensus of our sister circuits. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 325–26, 330, 339 (2012). In the interim, jail officials in our Circuit were not misled that they were obliged to follow our sister circuits' robust—and erroneous—consensus.

The lesson from *Powell* may apply here too, though in an opposite way: by affording prison officers less, not more, deference. Several circuits have held that prison officers need only reasonable suspicion to strip-search a visitor without her consent, *see* Majority Op. at 12. None have held to the contrary. Yet, I am not convinced that reasonable suspicion, as opposed to probable cause, is the correct standard, especially when the strip-searches of visitors involve body-cavity inspection and touching. Of course, we need not decide that question today. Under *any* standard, the officers' alleged conduct violated Ms. Gilmore's constitutional right to be free from an unreasonable seizure. But the majority's prudent approach—or what our colleague describes as "skirt[ing] the reason we took the case en banc," *see* Rosenbaum Concurring Op. at 1—will permit us to decide in a different appeal, if we must, whether probable cause, instead of reasonable suspicion, is the proper standard. We might then again disagree with all our sister circuits, and faced with that split, the Supreme Court might again reject the so-called "robust consensus." What matters for now is that Ms. Gilmore will get her

23-10343          WILLIAM PRYOR, C.J., Concurring          3

day in court regardless of the correct answer to the difficult question that we avoid.

23-10343         ROSENBAUM, J., Concurring in part                  1

ROSENBAUM, Circuit Judge, joined by JILL PRYOR and KIDD, Circuit Judges, concurring in part and in the judgment:

More than a quarter-century ago, the Supreme Court determined that a "robust consensus of cases of persuasive authority" can clearly establish the law, making qualified immunity inappropriate. The Court has since repeated this principle at least three times. So it's unsurprising that every circuit has recognized and accepted this principle to govern their qualified-immunity analyses.

Except us. To be sure, the Supreme Court's determination that a robust consensus of cases of persuasive authority can clearly establish the law binds us, too. But somehow, we expressly rejected that conclusion in an en banc decision twenty-four years ago. *See Marsh v. Butler County*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). Two years later, we doubled down on that position in *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003). And since then, we have continued acting like this Supreme Court rule doesn't apply to us.

I thought we might finally come into compliance with Supreme Court precedent when we voted Plaintiff-Appellant Clarissa Gilmore's case en banc. I was wrong. Instead, after en banc oral argument on whether a robust consensus of cases can clearly establish the law, we directed the parties to brief two other issues that allow us to skirt the reason we took the case en banc. And now, in a two-step move, we once again exempt ourselves from binding precedent. First, we cabin any "functionality" of the robust-consensus-of-persuasive-authority principle to cases of obvious

2          ROSENBAUM, J., Concurring in part          23-10343

clarity—that is, when, by definition, it's so obvious that conduct violates clearly established law that no precedent (controlling or persuasive) is necessary. And second, we decide not to determine whether a robust consensus of persuasive authority can clearly establish the law by precedent.

In my view, that's not why we took this case en banc. And it does next to nothing to bring our precedent into compliance with Supreme Court precedent. It also leaves officers uncertain about governing precedent in this Circuit.

This case presents an opportunity to correct our precedent and clarify the law. I would use it to do both. So though I concur in the Court's ultimate judgment, I write separately to respectfully explain what I think we should have done as an en banc court.

In particular, we granted en banc review to decide these questions:

> (1) Should we overrule in part *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc), and *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950 (11th Cir. 2003), so that a robust consensus of cases of persuasive authority may clearly establish law for purposes of abrogating an officer's qualified immunity; and

> (2) if so, did a robust consensus of cases of persuasive authority clearly establish that Plaintiff-Appellant Clarissa Gilmore's Fourth and Fourteenth Amendment rights were violated?

23-10343          ROSENBAUM, J., Concurring in part          3

As to the first question, the answer is no doubt "yes." We should overrule *Marsh* and *Thomas* to the extent that they hold that a "robust consensus of cases of persuasive authority" can't clearly establish the law because Supreme Court precedent says that it can. The Tjoflat Concurrence resists this answer. But Supreme Court precedent requires it. No need to take my word for it—as I've noted, every other circuit acknowledges that fact. We should, too.

As to the second question, by 2017, at the time Defendants strip searched Gilmore, seven circuits had held that the Fourth Amendment requires reasonable suspicion to strip search a prison visitor, and none had reached the opposite conclusion. *Gilmore v. Georgia Dep't of Corr.*, 111 F.4th 1118, 1135 (11th Cir.) (collecting cases), *reh'g en banc granted, opinion vacated*, 119 F.4th 839 (11th Cir. 2024). By any measure, that's a robust consensus of cases of persuasive authority that clearly establishes this principle by precedent.

And it slams the door shut on the Tjoflat Concurrence's insistence that it's impossible to know what comprises a "robust consensus." Indeed, ten of our sister circuits have defined the term. And under each circuit's definition, seven unanimous cases from the federal courts of appeals amount to a robust consensus of cases of persuasive authority. We should also hold as much.

To be sure, the Tjoflat Concurrence offers a few reasons why we shouldn't adopt the "robust consensus" standard and apply it in Gilmore's case. And the William Pryor Concurrence piggybacks

4                    ROSENBAUM, J., Concurring in part          23-10343

on the Tjoflat Concurrence, to provide an assist.  But the Concurrences' reasoning doesn't withstand scrutiny.

First, the Tjoflat Concurrence says Gilmore's situation presents a case of obvious clarity, so it's not necessary to overturn *Marsh* and *Thomas* and recognize that a "robust consensus" can clearly establish the law.  But using an en banc proceeding that requires us to determine whether Defendants are entitled to qualified immunity to announce the governing legal framework for evaluating a qualified-immunity claim is hardly ground-breaking.  To the contrary, it's appropriate.  After all, it prevents future defendants who violate clearly established rights, according to a "robust consensus of cases of persuasive authority," from escaping liability for their unconstitutional acts.

In fact, to further precisely this interest, the Supreme Court has authorized lower courts to address the merits of a Section 1983 claim, even when a merits determination is avoidable and unnecessary because the federal right was not clearly established.  *See Camreta v. Greene*, 563 U.S. 692, 706 (2011).  When it comes to qualified immunity, we're supposed to settle the law sooner, rather than later, so that officials don't "persist[] in the challenged practice" knowing that they "can avoid liability . . . because the law has still not been clearly established."  *Id.*

Second, the Tjoflat Concurrence argues we shouldn't adopt the "robust consensus" standard here because doing so wouldn't have provided Defendants with notice that they would be held liable for conduct that seven other circuits (though not we) had

23-10343          ROSENBAUM, J., Concurring in part          5

unanimously held unconstitutional before Defendants' challenged actions. But at the same time, the Tjoflat Concurrence declares that the law was clearly established as to the Officers here because it presented a case of obvious clarity. Meanwhile, the William Pryor Concurrence looks at the "robust consensus" standard that the Supreme Court has repeatedly invoked and exactly every other Circuit has adopted, and somehow it concludes that whether to adopt that standard presents a "difficult question" that we should avoid answering.

My colleagues can't have it both ways. If this is a case of obvious clarity, it offers the perfect opportunity to announce the correct legal framework for determining whether a right is clearly established going forward. Defendants had fair notice because of the obvious clarity. And at the same time, no future plaintiff with a plausible claim would have to endure officers' violations of their rights with impunity because we hadn't yet adopted the "robust consensus" standard.

Finally, the Tjoflat and William Pryor Concurrences argue I've "overlook[ed]" the fact that the "robust consensus" rule of the other circuits might be wrong. Pryor Conc. Op. at 1; *see also* Tjoflat Conc. Op. at 24–25, 27–28. And the Pryor Concurrence supposes that the "robust consensus" rule here might be wrong because it seems to have coalesced around a reasonable-suspicion standard, not a probable-cause one. *See* Pryor Conc. Op. at 2. Then the Pryor Concurrence seems to suggest that if we adopted the "robust consensus" standard, plaintiffs (including Gilmore) and would-be

6                ROSENBAUM, J., Concurring in part                23-10343

plaintiffs would fare worse in cases when we adopt a stricter rule than our sister circuits do.

Not so. Under the "robust consensus" standard, if we think the "robust consensus" rule that officers need only reasonable suspicion to perform the intrusive search here is wrong, then we can reach a different conclusion. We can instead hold that probable cause is necessary.

And if we adopted the "robust consensus" standard but did not adopt a "robust consensus" rule (here, that an officer must have reasonable suspicion (instead of probable cause) to conduct an invasive search of a prison visitor), the officers' pre-suit conduct and the plaintiff's ability to recover in the case of first impression would be the very same as if we didn't adopt the "robust consensus" standard.

In both situations (if we adopted the "robust consensus" standard and if we didn't), if officers had reasonable suspicion, but lacked probable cause, then they'd be entitled to qualified immunity because no decisions, not even those of our sister circuits, would have yet informed the officers that their conduct was unconstitutional. And in both situations, the unanimity of our sister circuits in adopting a rule that we ultimately didn't, would show that the officer was reasonable in acting as he did. So rejecting our sister circuits' rule would have precisely no effect on parties in the case before us if we adopted a stricter rule than our sister circuits. Nor would it affect any conceivable future case. But adopting the "robust consensus" standard would protect people's rights and

23-10343          Rosenbaum, J., Concurring in part                    7

authorize liability against officers who violate the "robust consensus" rule when we adopt the same rule as the other circuits. Again, it's for this very reason the Supreme Court has allowed lower courts to settle constitutional issues that "*may* be decided" before they technically "*must* be decided," *id.* at 1, so officers don't violate the Constitution merely because we have not yet clearly established the law, *see Greene*, 563 U.S. at 706.

I break my discussion into three parts. Part I summarizes why the Court's holding today does not accomplish much. Part II explains why we should hold that a "robust consensus of cases of persuasive authority" can clearly establish the law by precedent. And Part III shows that a "robust consensus of cases of persuasive authority" clearly establishes by precedent that the Fourth Amendment requires reasonable suspicion to strip search a prison visitor.

I.      **The Court's holding today makes no effective difference in our qualified-immunity jurisprudence.**

Qualified immunity attempts to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). To accomplish these dual goals, the doctrine protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010). The "clearly established"

requirement shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

Three limitations on the legal authorities that plaintiffs may use to advance their claims ensure that the governing law is, in fact, "clearly established" before a plaintiff may overcome a qualified-immunity defense. *See Gervin v. Florence*, 139 F.4th 1236, 1260–61 (11th Cir. 2025).

First, we limit the substance of the law a plaintiff may use. She "must point to (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). We sometimes refer to the third category as one of "obvious clarity"—that is, "the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *JW ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 (11th Cir. 2018).

Second, we limit the timing of the relevant case law: plaintiffs may rely on only the case law issued at the time of the official's act, not on law that developed later. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "If objective observers cannot predict—at the time the official acts—whether the act was lawful or not, . . . the official deserves immunity from liability for civil damages." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996).

23-10343          Rosenbaum, J., Concurring in part          9

And third, we limit the jurisdictions from which a plaintiff may identify applicable law: the plaintiff must point "to binding decisions of the Supreme Court of the United States, this Court, [or] the highest court of the relevant state." *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018). Other jurisdictions' precedent cannot clearly establish the law in our Circuit. *See Marsh*, 268 F.3d at 1032 n.10; *Thomas*, 323 F.3d at 955.

To be sure, the Court today holds that we may consider a "robust consensus of cases of persuasive authority" to determine whether the challenged conduct falls within the substantive obvious-clarity category. But most respectfully, it's hard to see why a "robust consensus of cases of persuasive authority" would ever be necessary in determining whether "the conduct at issue so obviously violated the Constitution *that prior case law is unnecessary*." *JW*, 904 F.3d at 1260 (emphasis added). And so, to me, our holding today feels performative, not substantive.

II.    **We should overrule in part *Marsh* and *Thomas* so that "a robust consensus of cases of persuasive authority" may clearly establish law for purposes of abrogating an officer's qualified immunity.**

This Part reviews the Supreme Court's precedent on "a robust consensus of cases of persuasive authority," shows how our precedent fails to follow that line of cases, and explains that we are a true outlier among the circuits.

I begin with *Wilson v. Layne*, 526 U.S. 603 (1999).  That is the first case when the Court said that a "consensus of cases of persuasive authority" can clearly establish the law.

There, the Court considered whether police officers violated the Fourth Amendment when, in executing an arrest warrant in a private home, they invited representatives of the media to accompany them.  *Id*. at 605.  Although the Court concluded that the media ride-along violated the Fourth Amendment, it held that the defendant officers were entitled to qualified immunity.  *Id*. at 606.  At the time of the media ride-along—which had occurred in the Fourth Circuit—only the Sixth Circuit had addressed a materially similar question.  *Id*. at 616 (citing *Bills v. Aseltine*, 958 F.2d 697 (6th Cir. 1992)).  The Sixth Circuit had reached essentially the same conclusion in *Bills* as did the Court in *Wilson*.  That is, the Sixth Circuit had held that material issues of fact precluded summary judgment on whether the police exceeded the scope of a search warrant by allowing a private security guard to participate in the search to identify stolen property other than that described in the warrant.  *Id*. at 616–17.

But the Court held that the single case from the Sixth Circuit could not clearly establish the constitutional violation at issue in *Wilson* in the Fourth Circuit.  As the Supreme Court explained, the Sixth Circuit's opinion was not "controlling authority in [the Fourth Circuit's] jurisdiction."  *Id*. at 617.  And although the case was of persuasive value, a lone case is not "a consensus of cases of persuasive authority such that a reasonable officer could not have

23-10343          ROSENBAUM, J., Concurring in part          11

believed that his actions were lawful." *Id.* Because the law was "undeveloped," the officers could not "have been 'expected to predict the future course of constitutional law.'" *Id.* at 618 (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978)). So the Court held that the lower courts appropriately found qualified immunity.

Since then, the Supreme Court has reaffirmed and further refined the "consensus of cases of persuasive authority" principle.

In *Aschroft v. al-Kidd*, the Court considered "whether a former Attorney General enjoys immunity from suit for allegedly authorizing federal prosecutors to obtain valid material-witness warrants for detention of terrorism suspects whom they would otherwise lack probable cause to arrest." 563 U.S. 731, 733 (2011). The Court concluded he did. As it explained, "not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional." *Id.* at 741.

Although a district-court decision supported the plaintiff's position, the Court rejected that case as sufficient to clearly establish law. As Justice Scalia put it, "a district judge's *ipse dixit* of a holding is not 'controlling authority' in any jurisdiction, much less in the entire United States; and his *ipse dixit* of a footnoted dictum falls far short of *what is necessary absent controlling authority: a robust 'consensus of cases of persuasive authority.'*" *al-Kidd*, 563 U.S. at 741–42 (emphasis added) (quoting *Wilson*, 526 U.S. at 617).

Up next, we have *Plumhoff v. Rickard*. There, the Court explained that to "defeat immunity" the plaintiff had to show "at a

minimum" that "either controlling authority *or a robust consensus of cases of persuasive authority*" established the asserted constitutional violation. 572 U.S. 765, 780 (2014) (cleaned up) (emphasis added).

To be sure, in two 2015 cases, the Court appeared to qualify its prior decisions. In *City and County of San Francisco v. Sheehan*, for instance, the Court quipped that "to the extent that robust consensus of cases of persuasive authority could itself clearly establish the federal right respondent alleges, no such consensus exists here." 575 U.S. 600, 617 (2015) (cleaned up). And it repeated its "to the extent" qualification in *Taylor v. Barkes*. 575 U.S. 822, 826 (2015) (per curiam) (quoting *Sheehan*, 575 U.S. at 826).

But the Court has since unqualifiedly confirmed that, by itself, a "robust consensus of cases of persuasive authority" can clearly establish the law. In *District of Columbia v. Wesby*, Justice Thomas, writing for the Court, explained that, to abrogate qualified immunity, the relevant legal rule "must be settled law, which means it is dictated by controlling authority *or a robust consensus of cases of persuasive authority*." 583 U.S. 48, 63 (2018) (cleaned up) (emphasis added). And in criticizing the reasoning that led the lower court to abrogate qualified immunity, the Court said that "neither the panel majority nor the [plaintiffs] have identified a single precedent—much less a controlling case or robust consensus of

23-10343          ROSENBAUM, J., Concurring in part          13

cases—finding a Fourth Amendment violation under similar circumstances." *Id.* at 65 (cleaned up) (alteration added).[1]

---

[1] The Tjoflat Concurrence invokes *Wesby*'s eighth footnote to argue that the Supreme Court has not ruled that a "robust consensus of cases of persuasive authority" can clearly establish the law. *See* Tjoflat Conc. Op. at 15–17. That's a swing and a miss. In fact, *Wesby*'s footnote eight neither draws nor supports any conclusion of the kind. *Wesby*'s footnote eight says, "We have not yet decided what precedents—other than our own—qualify as *controlling authority* for purposes of qualified immunity." 583 U.S. at 66 n.8 (emphasis added). And that footnote's reliance on *Reichle v Howards*, 566 U.S. 658, 665–66 (2012), illustrates that same thing: the Supreme Court hasn't yet defined the meaning of "controlling authority" in the qualified-immunity context. But the Supreme Court's recognition that it hasn't said what qualifies as "controlling authority" doesn't renounce the Court's earlier holdings that "controlling authority" (whatever may so qualify) and "persuasive authority" can both clearly establish the law. Indeed, nothing in the footnote the Tjoflat Concurrence points to undermines the Court's previous holding that "decisions in various Circuits" can provide a "warning [that] is fair enough" for officers to be held liable. *United States v. Lanier*, 520 U.S. 259, 269 (1997). Just the opposite. *Wesby* repeats that a "robust consensus of cases of persuasive authority" can clearly establish (or "settle[]") the law. *Wesby*, 583 U.S. at 63 (internal quotation marks omitted). And if *Wesby* left open the possibility that decisions of the courts of appeals are not *controlling authority*, then a "robust consensus of cases of persuasive authority" can abrogate qualified immunity all the more. Otherwise, only Supreme Court precedent could clearly establish the law—and no decision in the qualified-immunity context has accepted (or even suggested) that rule. *See Lanier*, 520 U.S. at 269 (explaining "that in applying the rule of qualified immunity," the Court has "referred to decisions of the Courts of Appeals when enquiring whether a right was 'clearly established'").

Attempting to thread *Wesby*'s footnote through *Lanier*'s holding, the Tjoflat Concurrence posits that the Supreme Court's understanding of "controlling authority" and "persuasive authority" may differ from ours. Tjoflat Conc. Op. at 16–17. From that, it conjects that the Supreme Court could have defined

14                 Rosenbaum, J., Concurring in part              23-10343

In short, over the last several years, the Supreme Court has established and repeatedly confirmed that a "robust consensus of cases of persuasive authority" can clearly establish the law.

The State of Georgia resists this fact. It characterizes the Supreme Court's repeated statements of the "robust consensus of cases of persuasive authority" as "unexplained dicta." The Tjoflat Concurrence chimes in, too, asserting that the Supreme Court "has never held that persuasive precedent can clearly establish the law." Tjoflat Conc. Op. at 18.

He and the State misunderstand. Of course, we are not bound by every thought or musing in the United States Reports. Only the Supreme Court's "holdings" bind us.[2] *Andrew v. White*,

---

"persuasive authority" to mean only binding precedent from the immediate appellate court, not out-of-circuit authority. *Id*. But that musing runs headlong into *Wilson*, which considered the Sixth Circuit case the plaintiff proffered to be persuasive authority, even though it was not a Fourth Circuit case. *See* 526 U.S. at 616–17 (explaining the proffered Sixth Circuit authority was neither "controlling authority [in the plaintiffs'] jurisdiction" nor part of "a *consensus* of cases of persuasive authority" (emphasis added)). Plus, even if we assumed in-circuit precedent could never qualify as "controlling authority"—a position contrary to every circuit's current application of Supreme Court precedent— the notion that a "robust consensus of cases" of in-circuit precedent would be necessary to clearly establish the law within a single circuit is nonsensical, given the prior-panel-precedent rule, which binds every panel to a prior panel's holding unless and until that the Supreme Court or our en banc Court abrogates it. *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001).

[2] Still, we have emphasized the importance of Supreme Court dicta. *See, e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta. . . . We have

23-10343          ROSENBAUM, J., Concurring in part          15

145 S. Ct. 75, 82 (2025); *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 39 (2025).

But the Court has unambiguously told us that when it uses "a legal rule or principle to decide a case, that principle is a 'holding' of the Court." *Andrew*, 145 S. Ct. at 81.[3] That's so, even if the legal principle it announces isn't "strictly necessary to a court's judgment," like when we choose between "two competing legal 'tests.'" *United States v. Files*, 63 F.4th 920, 927–28 (11th Cir.), *cert. denied*, 144 S. Ct. 419 (2023). We consider that choice binding "even when it's not clear that the case would have turned out differently under the other" test. *Id.* at 928.

After all, "no one thinks that when we *do* state a governing rule—as we typically do—we do so gratuitously and unnecessarily." *Id.* at 928 & n.5 (citing Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 STAN. L. REV. 953, 984–86 (2005)). In

---

previously recognized that 'dicta from the Supreme Court is not something to be lightly cast aside.'" (citations omitted)).

[3] The Tjoflat Concurrence argues that the Supreme Court limited *Andrew*'s rule about what constitutes a holding to the AEDPA context. Tjoflat Conc. Op. at 18 n.1. But its argument conflicts with our own precedent, which applies *Andrew*'s understanding of a holding to all contexts. *See Files*, 63 F.4th at 928 (confirming "statements of a legal rule" are holdings). Plus, even if we weren't bound by our precedent, *Andrew* itself cited qualified-immunity cases to explain why the appellate court erred in refusing to apply the applicable legal principle, confirming that its holding-dicta distinction applies with equal force here. *See Andrew*, 145 S. Ct. at 82 (citing *Taylor v. Riojas*, 592 U.S. 7, 8 (2020), and *Hope v. Pelzer*, 536 U.S. 730 (2002), in a discussion about when general legal principles may clearly establish the asserted violation).

other words, declaring the minimum threshold that a plaintiff must meet to prevail on a claim does not somehow turn the Court into a "roving commission" attempting to "publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Rather, it establishes a governing principle to resolve the "question actually before the Court." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.).

The "robust consensus" standard is exactly that: a legal rule that the Supreme Court has announced in setting the minimum threshold for a plaintiff to succeed in a Section 1983 claim. Indeed, the Court keeps invoking it in resolving Section 1983 cases precisely because it is a governing principle. Plaintiffs may rely on a "robust consensus of cases of persuasive authority" to "defeat immunity," *Plumhoff*, 572 U.S. at 780, because it is "what is necessary absent" other case law that is sufficient to defeat immunity—"controlling authority," *al-Kidd*, 563 U.S. at 741–42.

As every other circuits' adoption of the "robust consensus" standard shows, the Tjoflat Concurrence's attempt to avoid the binding nature of the Supreme Court's announcement of the "robust consensus" standard is unpersuasive. *See* Tjoflat Conc. Op. at 9–20.

Under the Tjoflat Concurrence's logic, a legal rule can become a holding only when a plaintiff prevails under it. The Tjoflat Concurrence would conclude that judgments for defendants can't establish legal principles because a court could always alter the

23-10343        Rosenbaum, J., Concurring in part        17

relevant threshold in a future case. But that's not how precedent works.

An example proves the point. No court or litigant would say *Strickland v. Washington* did not announce the legal rule governing ineffective-assistance-of-counsel claims, even though, in that case, Strickland failed "to make the required showing of either deficient performance or sufficient prejudice." 466 U.S. 668, 700 (1984). In fact, both the Supreme Court and we have described *Strickland*'s standard as a holding and as binding precedent. *See, e.g., Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (describing *Strickland*'s holding); *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1347 (11th Cir.) (same), *cert. denied*, 145 S. Ct. 443 (2024).

The Supreme Court's articulation of the "robust consensus" standard in *Wilson* is a holding in the same way *Strickland*'s test is. *Wilson* held that a single out-of-circuit case can't clearly establish the law. 526 U.S. at 617. Had one, persuasive, and on-point case been sufficient, the *Wilson* plaintiff could have succeeded. So by clarifying the evidentiary bar that a plaintiff must meet to succeed on Section 1983 claims—that is, at a minimum, "a consensus of cases of persuasive authority," *id.*—the Court issued a holding that binds us. That's so despite the Court's additional rationale that a split of authority among circuits had developed during the litigation of the case. After all, "our precedent treats alternative holdings 'as binding as solitary holdings.'" *Files*, 63 F.4th at 927 (quoting *Bravo v. United States*, 532 F.3d 1154, 1162 (11th Cir. 2008)).

The Tjoflat Concurrence can't escape the Supreme Court's repeated recognition of the "robust consensus" standard by trying to reimagine what the Supreme Court has said. The Tjoflat Concurrence claims, for instance, that in *al-Kidd*, the Supreme Court used the phase about a "robust consensus of cases of persuasive authority" merely "descriptively—to underscore how far the plaintiff's argument fell short." Tjoflat Conc. Op. at 13.

The Supreme Court did no such thing. Here's what the Court said: "Even a district judge's *ipse dixit* of a holding is not 'controlling authority in any jurisdiction, much less in the entire United States; and his *ipse dixit* of a footnoted dictum falls far short of *what is necessary absent controlling authority: a robust 'consensus of cases of persuasive authority.'"* *al-Kidd*, 563 U.S. at 741–42 (emphasis added) (quoting *Wilson*, 526 U.S. at 617). There is simply no accurate way to read these statements—whether in isolation or in the context of the rest of the opinion—to mean anything other than that a plaintiff can precedentially show the law is clearly established in either of two ways: with "controlling authority" or with "a robust consensus of cases of persuasive authority." A "robust consensus of cases of persuasive authority" is no more "descriptive" than is "controlling authority." They're both governing legal standards. And no amount of reimagining or naysaying changes that.

So Judge Tjoflat's conjecture that the Supreme Court announced the "robust consensus" standard as something that *"might"* equate to settled law, Tjoflat Conc. Op. at 16, finds support only in *Sheehan*'s and *Barkes*'s qualifiers. But *Wesby* dropped that

qualifier, and *Sheehan* and *Barkes* cannot bear their weight when we look at the Court's qualified-immunity precedents in full view. Indeed, the Court long ago explained that the "disparate decisions in various Circuits" can offer a "warning" to officials that "is fair enough" to impose liability. *United States v. Lanier*, 520 U.S. 259, 269 (1997) (rejecting the Sixth Circuit's rule that only Supreme Court decisions can provide fair notice to officials of constitutional violations).

That's why every single one of our eleven geographically based sister circuits—the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and District of Columbia Circuits— uniformly abides by the principle that a "robust consensus of cases of persuasive authority" can clearly establish the law in qualified-immunity cases.[4]  *See, e.g.*, *Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020); *Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019); *James v. N.J. State Police*, 957 F.3d 165, 170 (3d Cir. 2020); *Johnson v. Robinette*, 105 F.4th 99, 120–21 (4th Cir. 2024); *Lincoln v. Scott*, 887 F.3d 190, 197 (5th Cir. 2018); *Akima v. Peca*, 85 F.4th 416, 423 (6th Cir. 2023); *Est. of Davis v. Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021); *De La Rosa v. White*, 852 F.3d 740, 745–46 (8th Cir. 2017); *Hopson v. Alexander*, 71

---

[4] The Federal Circuit addressed a separate issue where it employed a clearly-established-law framework.  It acknowledged in a string citation that "clearly established law in the qualified immunity context" includes "cases from the Supreme Court and the U.S. Court of Appeals" for the relevant circuit, as well as "cases from other courts exhibiting a consensus view." *U.S. Capitol Police v. Off. of Compliance*, 916 F.3d 1023, 1027 (Fed. Cir. 2019) (cleaned up) (quoting *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011)).

F.4th 692, 697, 707 (9th Cir. 2023); *Lewis v. City of Edmond*, 48 F.4th 1193, 1198 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1055 (2023); *Vasquez v. District of Columbia*, 110 F.4th 282, 288 (D.C. Cir. 2024).

Only we do not. In *Marsh*, we expressly rejected *Wilson*'s standard, saying only that we did "not understand *Wilson* . . . to have held that a 'consensus of cases of persuasive authority' from other courts would be able to establish the law clearly." *Marsh*, 268 F.3d at 1032 n.10 (quoting *Wilson*, 526 U.S. at 617). *Marsh* offered the rationale that, because "splits between jurisdictions on matters of law are not uncommon," officials should not have "to sort out the law of every jurisdiction in the country." *Id.*

But for three reasons, that can't excuse our failure to abide by Supreme Court precedent.

First, it's simply not accurate to describe the Court's *Wilson/al-Kidd/Plumhoff/Wesby* "robust consensus of cases of persuasive authority" standard as requiring officials "to sort out the law of every jurisdiction in the country." As I explain more in the next section, a "robust consensus" means there's strong agreement, and the Supreme Court has already told us that district-court decisions can't clearly establish the law. *See al-Kidd*, 563 U.S. at 741–42; *Camreta*, 563 U.S. at 709 n.7 ("[D]istrict court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.").

Second, complying with the "robust consensus" standard hasn't been a problem for law enforcement in any of our eleven

23-10343          ROSENBAUM, J., Concurring in part          21

sister circuits. And it's not clear to me why the Eleventh Circuit will experience some unique trouble in applying that same principle. In fact, the Supreme Court rejected these workability concerns decades ago. As the Court has explained, although "disparate decisions in various Circuits might leave the law insufficiently certain even on a point widely considered," it is just a "circumstance" to "be taken into account in deciding whether" the law provides a "warning" to officers that "is fair enough." *Lanier*, 520 U.S. at 269.

Plus, even our Circuit's formulation—that only decisions from the Supreme Court, the Eleventh Circuit, or the highest court of the state can clearly establish the law—has always functioned under a legal fiction. No one really thinks that officers have the time to read, understand the significance of, and be up to date on all governing case law, while still performing their law-enforcement functions. But we indulge the legal fiction that precedent gives officers notice, anyway. We do so because we know that law-enforcement departments have legal counsel whose job it is to stay on top of constitutional-law developments that affect officers' responsibilities and to educate those officers about the law. And when a "robust consensus of cases of persuasive authority" coalesces on an issue—no matter whether the cases are inside or outside a law-enforcement department's jurisdiction—you can be sure that counsel tracks that. After all, that's counsel's job. Indeed, conferences and seminars are regularly held on national developments in the law.

And third, we're talking about binding Supreme Court precedent. Compliance isn't optional and we shouldn't treat it that way.

So *Marsh* and its reasoning fail.  *Thomas* is no better.  It just doubled down on *Marsh*'s errors by invoking our prior-panel precedent rule: *Thomas* stated simply that *Marsh* "implicitly reaffirmed" our pre-*Wilson* position so that any "argument based upon decisions in other circuits [was] foreclosed by our precedent."  323 F.3d at 955 (citing 268 F.3d at 1032 n.10).  *Marsh* and *Thomas* offer no reason to avoid adopting binding Supreme Court precedent.  And I would abrogate them and hold, as Supreme Court precedent requires, that a "robust consensus of cases of persuasive authority" can clearly establish the law.

### III. A "robust consensus of cases of persuasive authority" clearly established that Plaintiff-Appellant Clarissa Gilmore's Fourth and Fourteenth Amendment rights were violated.

So what does a "robust consensus of cases of persuasive authority" mean?  This Part first defines the standard through the Supreme Court's guidance, the practice of our sister circuits, and the principle of fair notice that guides every qualified-immunity inquiry.  Then this Part applies the "robust consensus" standard to Gilmore's claims.  Gilmore's claim meets any reasonable definition of a robust consensus of cases of persuasive authority, so Defendants do not enjoy qualified immunity.

> A. *If several unanimous decisions from federal appellate courts agree on a legal rule, they make up a "robust consensus of cases of persuasive authority."*

23-10343          Rosenbaum, J., Concurring in part          23

Luckily, we don't need to write on a blank slate when we determine the meaning of a "robust consensus of cases of persuasive authority." Contrary to the Tjoflat Concurrence's suggestion, this isn't an area of law where "nobody knows" how to apply the controlling principle. Tjoflat Conc. Op. at 20.[5]   We're not

---

[5] The Tjoflat Concurrence suggests that because no uniform rule about what constitutes a "robust consensus" exists, the standard undermines qualified immunity's core purpose of fair notice. Tjoflat Conc. Op. at 21–22. That logic misunderstands the difference between persuasive and controlling authority. Yes, any definition of a "robust consensus of cases of persuasive authority" would necessarily refer to the concept of persuasive authority. But if we used this opportunity to define what a "robust consensus" is in the Eleventh Circuit, then we would create controlling precedent on that definition. And officers would have fair notice of when a constitutional violation is clearly established under that standard in this Circuit. It makes no difference that we may define the "robust consensus" standard differently than other circuits do because our definition would control in this Circuit under our prior-panel-precedent rule. *See GTE Corp.*, 236 F.3d at 1300 n.8. After all, circuits occasionally split on substantive law in Section 1983 cases. But no one would suggest a circuit split deprives officers in one circuit of fair notice if their circuit has already held that certain conduct violates clearly established rights: the officers know to which side of the split their circuit adheres. *See, e.g.*, *Laskar v. Hurd*, 972 F.3d 1278, 1294, 1298 (11th Cir. 2020) (acknowledging "that our conclusion departs from the consensus of our sister circuits" but confirming the plaintiff alleged that the defendants "violated clearly established law" under our precedent). The same is true of the meaning of "robust consensus." Controlling precedent governs in both situations. Plus, the implication of the Tjoflat Concurrence's suggestion that we need not follow Supreme Court precedent if we don't agree with it—that is, we need not accept the "robust consensus" standard even though the Supreme Court has repeatedly identified it as a governing standard, just because the Tjoflat Concurrence finds it wanting—is simply untenable.

24                ROSENBAUM, J., Concurring in part           23-10343

attempting to discern the meaning of life or design a spaceship to take us to other galaxies. We're talking about applying a legal standard—"robust consensus of cases of persuasive authority"—that our sister circuits have applied for years and that the decisions of the Supreme Court help explain. Indeed, the Supreme Court Court's decisions and those of our sister circuits offer a workable framework for courts and litigants to employ in applying the "robust consensus" standard.

I begin with Supreme Court precedent. Two firm rules follow from Supreme Court holdings.

First, out-of-circuit federal appellate decisions can clearly establish the law. The Court told us as much in *Wilson*. *See* 526 U.S. at 617. It's just that a single out-of-circuit decision standing alone can't do so. *See id*. at 616–17. And that makes sense. After all, how could a single case standing alone ever satisfy the definition of a "robust consensus"?[6]

Second, the persuasive authorities generally must be unanimous in their view. Take *Wilson*, for instance. There, the Court found the law wasn't clearly established. In reaching this conclusion, the Court found significant that "[b]etween the time of the events of th[e] case and [the Court's] decision, a split among the

---

[6] We don't parse the text of court opinions like we do statutes. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Still, we are bound by Supreme Court holdings and want to be faithful to them. "Consensus" means "[a] general agreement; collective opinion." BLACK'S LAW DICTIONARY 382 (12th ed. 2024). So by definition, more than one decisionmaker must be involved.

Federal Circuits in fact developed on the question whether media ride-alongs that enter homes" constitute a violation of the Fourth Amendment. *Id.* at 618. "If judges thus disagree on a constitutional question," the Court explained, "it is unfair to subject police to money damages for picking the losing side of the controversy." *Id.*; *see also Pearson*, 555 U.S. at 244–45 (holding officers were entitled to rely on a doctrine accepted by "three Federal Courts of Appeals and two State Supreme Courts," even though "their own Federal Circuit had not yet ruled on" it). So unless no one could reasonably believe that we would follow the minority approach, we should not consider an alleged constitutional violation to be clearly established when the federal courts of appeals and state supreme courts split in their views. *See Fowler*, 979 F.3d at 78.

But beyond these core holdings, the Supreme Court has not fleshed out the scope of the "robust consensus" standard. Nor has the Court identified the minimum amount of persuasive authority that a plaintiff must muster to show that reasonable state officials had fair notice of the alleged constitutional violation.

That's where our sister circuits come in. Over the past several decades, our sister circuits have developed some case law on what amounts to a "robust consensus of cases of persuasive authority."

To start, all our sister circuits agree that "[a] robust consensus does not require the express agreement of every circuit." *Id.* at 76. That is, the "robust consensus" standard does not benefit only the plaintiff who is last in line.

As for the minimum number of cases necessary to amount to a "robust consensus," our sister circuits have offered a narrow range of answers. At the lower end of the spectrum, the Seventh and Eighth Circuits have determined that precedential decisions from as few as two sister circuits can clearly establish the law. *See, e.g., Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016) (discussing three combined decisions from two circuits); *Hayes v. Long*, 72 F.3d 70, 74 (8th Cir. 1995) (relying on decisions from two circuits and one district court).

But two are not enough in other circuits. At least four circuits have found a "robust consensus" when three other circuits have unanimously agreed in precedential decisions. *See, e.g., Maldonado v. Fontanes*, 568 F.3d 263, 270–71 (1st Cir. 2009); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997); *Williams v. Bitner*, 455 F.3d 186, 193 (3d Cir. 2006); *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir. 1991). A fifth—the Ninth Circuit—has described the agreement of three other circuits' precedential decisions as a "robust consensus" in a case where it also concluded that the Ninth Circuit's own precedent clearly established the law. *Tuuamelemalo v. Greene*, 946 F.3d 471, 477–78 (9th Cir. 2019).

Three other circuits that have applied the "robust consensus" test have done so when more circuits have unanimously agreed on the law. But two of these circuits have not opined on whether the agreement of fewer circuits in precedential decisions could create a "robust consensus."

23-10343          Rosenbaum, J., Concurring in part          27

The Fourth Circuit, for instance, found a "clear consensus of persuasive authority" when five sister circuits had precedential decisions on point. *Williamson v. Stirling*, 912 F.3d 154, 188 (4th Cir. 2018). But the court didn't hold that a "robust consensus" couldn't exist with fewer than five. Similarly, the Fifth Circuit determined a "robust consensus of persuasive authority existed" when four circuits had precedential decisions on the issue and two other circuits had non-precedential decisions. *Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019). Like the Fourth Circuit, the Fifth Circuit did not opine on whether fewer decisions could comprise a "robust consensus."

As for the Tenth Circuit, it has said that "the weight of authority from other circuits may clearly establish the law when at least six other circuits have recognized the right at issue." *Irizarry v. Yehia*, 38 F.4th 1282, 1284 (10th Cir. 2022). Even so, the Tenth Circuit's holding is somewhat nuanced. Four of the six other circuit decisions established the relevant right on "facts materially similar" to those at issue in the Tenth Circuit's case, and the remaining two opinions expressed a relevant broad principle. *See id.* at 1294–95.

To sum up, then, ten circuits have applied the "robust consensus" standard. Even when we view those decisions to apply the standard most stringently, every one of those circuits has concluded that the precedential decisions of fewer than seven other circuits can make up a "robust consensus." In other words, a robust—indeed super-"robust"—consensus of circuits agrees that, at the very

28          ROSENBAUM, J., Concurring in part          23-10343

most, six precedential decisions are necessary for a "robust consensus."

That said, some very good reasons support a lower threshold than six. Given the seven-circuit weight of authority that abides by a three- (or two-) circuit consensus, I focus my comments on that number.

On the one hand, a three-circuit precedential-decision requirement ensures plaintiffs may successfully vindicate their constitutional rights. Requiring too many appellate courts to address an issue before concluding that a "robust consensus" exists would fail to "hold public officials accountable when they exercise power irresponsibly." *Pearson*, 555 U.S. at 231. After all, it is "rare[]" to find an "overwhelming consensus of authority" from "nearly every court of appeals" that recognizes the challenged "conduct is violative of a constitutional right." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017). A high threshold, then, allows an official to escape "liability for unlawful conduct due to the fortuity that a court in a particular jurisdiction had not yet had the opportunity to address the issue." *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989). Congress had no such intention when it enacted Section 1983, and *Harlow* did not plan to "provide . . . license to lawless conduct." 457 U.S. at 819.

On the other hand, concluding a "robust consensus of cases of persuasive authority" exists when at least three federal appellate courts align on an issue in precedential decisions appropriately "shield[s] officials from harassment, distraction, and liability when

23-10343        ROSENBAUM, J., Concurring in part        29

they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Three decisions can constitute "a clear trend in the caselaw" that gives "fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Brutsche*, 881 F.2d at 431 (relying on three federal appellate decisions to conclude defendants may have violated clearly established law); *cf.* IAN FLEMING, GOLDFINGER 166 (Penguin Books 2002) ("Mr. Bond, they have a saying in Chicago: Once is happenstance. Twice is coincidence. The third time it's enemy action.").

Plus, as I've noted, even if several courts perfectly align on a federal issue, contrary persuasive authority may suggest the law is still sufficiently "undeveloped" that it would be "unfair to subject police to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S at 617–18; *Pearson*, 555 U.S. at 244–45.

For instance, defendant officials may benefit from divisions in the case law that develop after the relevant conduct in a dispute. *See Wilson*, 526 U.S at 617–18. Or something unique about our own precedent may make it reasonable for an officer to believe we would not follow the existing "robust consensus." *Compare Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014) (discounting persuasive authority from two other circuits because an in-circuit unpublished opinion supported the officer's position), *with Fowler*, 979 F.3d at 78 (holding, based on in-circuit precedent, that "defendants could not reasonably have believed that we would" follow the minority rule). So the Supreme Court's stringent clarity and consensus

30                ROSENBAUM, J., Concurring in part              23-10343

requirements create a backstop against liability for reasonable state officers.

Put simply, when three federal appellate holdings clearly "apply . . . to the specific conduct in question," *Lanier*, 520 U.S. at 271, it won't be "a fortuitous coincidence" that we follow suit, *Martin v. Heckler*, 773 F.2d 1145, 1153 (11th Cir. 1985) (en banc) (adding that "[h]armony among circuits should be a goal" and that "the law is well served by a court's attempt to achieve uniformity of decision"), *disapproved of on other grounds by Texas State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989). Persuasive case law will have offered a warning that is "fair enough" to expose defendants to monetary remedies for their violation of federal rights. *Lanier*, 520 U.S. at 269.[7]

The Tjoflat Concurrence complains that the "robust consensus" standard "severs" qualified immunity "from what the law actually is" by clearly establishing law before we address the pertinent

---

[7] To the extent that the Tjoflat Concurrence suggests that the "robust consensus" standard somehow makes the opinions of our sister circuits binding and turns us into a "spectator," Tjoflat Conc. Op. at 24, that's just wrong. We're always free to differ on the merits from the views of other circuits, no matter how many other courts may unanimously agree with the opposite merits position. For that same reason, the Tjoflat Concurrence is wrong again in asserting that the "robust consensus" standard would force us to impose liability even if we think officials' conduct is lawful or when other circuits disagree with us. *Id.* at 23–24. My point is a simple one: *if* we agree with several other federal appellate courts on a legal principle that clearly applies "to the specific conduct in question," *Lanier*, 520 U.S. at 271, then officials will have had notice that is "fair enough" to impose damages liability, *id.* at 269.

23-10343          Rosenbaum, J., Concurring in part          31

legal issue and by causing officers to prophylactically conform to decisions from our sister circuits (the "prophylactic-conformance argument"). Tjoflat Conc. Op. at 25. The William Pryor Concurrence repeats a similar concern, suggesting officials are "obliged" and "misled" to follow the "robust consensus," even if we ultimately decide it's wrong. Pryor Conc. Op. at 2. Three, independent points doom this argument.

First, to the extent that the argument assumes officers would respect non-existent constitutional rights, the argument misunderstands the point of qualified immunity. The doctrine protects individuals who "make reasonable but mistaken judgments." *al-Kidd*, 563 U.S. at 743. It is not a license for state officials to push constitutional boundaries with impunity. "Where an official *could* be expected to know that certain conduct *would* violate statutory or constitutional rights, he *should* be made to hesitate . . . ." *Harlow*, 457 U.S. at 819 (emphasis added). And that hesitation (that is, prophylactic conformance) is warranted when a "robust consensus of cases of persuasive authority" informs officers that they are pushing constitutional boundaries. *See al-Kidd*, 563 U.S. at 741–42; *Wilson*, 526 U.S. at 617 (explaining a "consensus of cases of persuasive authority" can cause "a reasonable officer" not to "believe[] that his actions were lawful"). To be sure, we may ultimately rule that official conduct falls on the permissible side of the constitutional line. But if we decide otherwise, the state official had warning that was "fair enough" to impose liability. *Lanier*, 520 U.S. at 269.

32              ROSENBAUM, J., Concurring in part          23-10343

Second, to the extent the argument assumes we would prefer to adopt stronger constitutional rules than those of our sister circuits, *see* Pryor Conc. Op. at 2, the "robust consensus" standard would not affect how we approach qualified immunity in those cases. We would always be free to reject a "robust consensus" of our sister circuits and adopt a stronger constitutional rule or protect additional federal rights.

And doing so would change exactly nothing from how we operate currently, without the "robust consensus" standard. In both situations—either with or without the "robust consensus" standard—if we adopted a stronger constitutional rule than our sister circuits, the officer whose conduct matched the other circuits' rule would still be entitled to qualified immunity in that case of first impression. After all, even if we're more protective of a plaintiff's rights than are our sister circuits, if several of our sister circuits unanimously thought that the officers' conduct didn't violate the Constitution, a plaintiff couldn't establish that no reasonable officer would have engaged in the officer's conduct there. *See Wilson*, 526 U.S. at 618; *Pearson*, 555 U.S. at 244–45.

And third, even on the argument's own logic, it proves too much. The prophylactic-conformance argument's logic would require us to overturn our current precedent that decisions of the relevant state supreme court can clearly establish the law. If it truly "makes no sense" to consider the law clearly established when it's possible we may decide otherwise on the merits, Tjoflat Conc. Op. at 25, then it equally "makes no sense" for our qualified-immunity

precedent to credit state-court decisions. Those don't bind us when it comes to federal questions. *Gallardo ex rel. Vassallo v. Dudek*, 963 F.3d 1167, 1180 (11th Cir. 2020), *aff'd sub nom. Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420 (2022). So under our current governing standard, which allows rulings of the highest state court to clearly establish the law, precisely the same potential for the alleged prophylactic-conformance situation exists.

The highest court of a state could clearly establish a constitutional violation before we have reason to consider the issue. So officers in that state would have to prophylactically comply. But we might later disagree with that state supreme court's view of federal law. And if we did, those officers would have prophylactically respected nonexistent constitutional rights. Yet we've always considered a state supreme court decision sufficient to clearly establish the law. *See Marsh*, 268 F.3d at 1032 n.10.

The Tjoflat Concurrence tries to escape this problem by asserting that I "misunderstand[] both our precedent and how the notice inquiry works." Tjoflat Conc. Op. at 26. But deflecting doesn't cure the Tjoflat Concurrence's problem.

In particular, the Tjoflat Concurrence argues that "officials must conform their conduct to [a state supreme] court's rulings or risk liability [for federal constitutional violations] in their own state courts." *Id.* at 26. And to be sure, a state supreme court decision *could* bind a state officer that is a state-court defendant. But in the context of Section 1983, that's not a likely—or even a plausible—risk. A Section 1983 defendant can always remove to a federal

forum that may not agree with the state court's reading of federal law. *See, e.g.*, 28 U.S.C. § 1441(a). And he or she always will in that circumstance. So in reality—not the Tjoflat Concurrence's hypothetical—a state supreme court decision that gets ahead of our precedent is no different than a "robust consensus of cases of persuasive authority" that also gets ahead of our precedent.

Plus, even as to the potential liability of state officials under state law in state court or administrative proceedings, the Tjoflat Concurrence's point is illusory. The Tjoflat Concurrence posits that state officers would conform to state law, even if it differs from federal law, because they would face "state tort liability, administrative discipline, or evidentiary exclusion in criminal proceedings" if they didn't. Tjoflat Conc. Op. at 26–27. But that analysis rests on a faulty premise.

Under state law in all three states in the Eleventh Circuit, official immunity protects state officials' acts unless they are "performed with actual malice or with intent to cause injury." *Dukes v. Deaton*, 852 F.3d 1035, 1044 (11th Cir. 2017) (Georgia law); *Grider v. City of Auburn*, 618 F.3d 1240, 1254–55 (11th Cir. 2010) (noting that, under Alabama law, a state agent is not immune if the plaintiff "show[s] 'bad intent'"); *Baxter v. Roberts*, 54 F.4th 1241, 1270 (noting that, under Florida law, an officer "may not be held personally liable . . . unless such officer . . . acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" (emphases omitted) (quoting Fla. Stat. § 768.28(9)(a))). To be clear, "[a]ctual malice means 'a

deliberate intention to do wrong, and does not include implied malice, i.e., the reckless disregard for the rights or safety of others'"; an officer must intend "to cause the harm suffered by the plaintiffs." *Dukes*, 852 F.3d at 1045 (quoting *Murphy v. Bajjani*, 282 Ga. 197, 203 (2007)).

That's a much higher standard than qualified immunity imposes. As we've explained, "[q]ualified immunity invokes an objective standard; that is, if a reasonable person in the defendant's place could have acted the same way, the defendant's subjective intent is irrelevant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558 n.6 (11th Cir. 1993).

The upshot is that, under state law, if an officer doesn't act with "a deliberate intention to do wrong," she doesn't risk liability under state law, even if she violates state rights she should have known about and even if she would be liable under federal law if it were the same as state law. So contrary to the Tjoflat Concurrence's suggestion that officers must follow state law even if it differs from federal law at the risk of personal liability, that's simply not so, as long as the officer doesn't act with "actual malice." And to the extent that state law conflicts with a robust consensus of persuasive authority under federal law, it's hard to imagine how an officer complying in good faith with federal law could act with "actual malice" under state law.

Apparently aware of this disconnect, the Tjoflat Concurrence tries to muddy the waters by arguing that it's simply unfair to hold officers in this Circuit to a "robust consensus of cases of

36                    ROSENBAUM, J., Concurring in part              23-10343

persuasive authority" because the standard of "fair notice demands more than persuasive reasoning." Tjoflat Conc. Op. at 27. But if a "robust consensus of cases of persuasive authority" were the law here like it is in *every other circuit*, officers would have both legal and institutional reasons to be aware of decisions from other circuits. As I've explained, *see supra* at 20–21, the notion that officers themselves keep on top of all legal developments without any guidance is a legal fiction. Instead, attorneys regularly provide officers with legal information so they will understand and follow the law. Around the country, lawyers update law-enforcement officers on legal developments not only from their own circuits but also from a "robust consensus of cases of persuasive authority." It's just silly to suggest that Eleventh Circuit attorneys would be incapable of similarly educating law-enforcement officers with whom they work and that officers here can't get fair notice from a "robust consensus of cases of persuasive authority" when every other officer in the country can. Simply, if we adopted the "robust consensus" standard, then officers will receive "fair notice."

The Tjoflat Concurrence's prophylactic-nonconformance misfire is even more apparent when we consider our panel opinions. Panel opinions may clearly establish the law, but an en banc court may always disagree later. No matter whether "[a] published panel decision is binding when issued," Tjoflat Conc. Op. at 27, if the en banc court vacates it and changes the rule, officers will have prophylactically conformed to the panel decision in the intervening period. And that's precisely the alleged harm the Tjoflat Concurrence complains of.

23-10343    Rosenbaum, J., Concurring in part    37

Perhaps sensing this problem, the Tjoflat Concurrence tries to move the goal posts from its original stated concern of prophylactic conformance. It responds that "[p]anel decisions and state supreme court rulings provide fair notice to officials because they carry legal force at the time of the conduct." *Id.* Okay. But that doesn't address the original "problem" the Tjoflat Concurrence raises of prophylactic conformance—that is, respecting nonexistent rights—when we later disagree with a state supreme court or panel opinion. After all, regardless of notice concerns—which we all agree drive liability under qualified immunity—when we interpret federal law, we necessarily decide what the law *"always* meant." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 313 n.12 (1994); *see id.* at 312–13 ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."). As a result, when officers follow panel opinions that our en banc Court later overturns, it means they respected rights that never existed in the first place.

So the Tjoflat Concurrence's arguments are not unique to the "robust consensus" standard. And our precedent already implicitly rejects their logic. Prophylactic adherence isn't qualified immunity's lodestar; fair notice is. So the law can be clearly established at the time of the alleged misconduct even if it is eventually disputed.

In short, persuasive case law can and does afford state officers fair notice of violations of federal rights. Still, this dispute

requires us to consider only whether unanimous decisions from seven of our sister circuits can clearly establish an alleged statutory or constitutional violation. That's so because, as I discuss in the next section, by 2017, at the time of the relevant conduct, at least seven federal appellate courts had held that prison officials must have reasonable suspicion to strip search a prison visitor. So any reasonable definition of a "robust consensus of cases of persuasive authority" means Gilmore defeats qualified immunity. *Cf. Rucho v. Common Cause*, 588 U.S. 684, 744 (2019) (Kagan, J., dissenting) ("How about the following for a first-cut answer: This much is too much.").

> B. *At the time of Defendants' alleged misconduct, seven unanimous decisions from federal appellate courts clearly established that prison officials need reasonable suspicion to strip search a visitor.*

Our precedent requires "reasonable suspicion for strip searches of arrestees, students, and border entrants." *Gilmore*, 111 F.4th at 1131; *see Evans v. Stephens*, 407 F.3d 1272, 1279–80 (11th Cir. 2005) (en banc) (arrestees); *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 969 (11th Cir. 2002) (same); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (student); *T.R. ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 882, 855, 888 (11th Cir. 2022) (same); *United States v. Alfaro-Moncada*, 607 F.3d 720, 729 (11th Cir. 2010) (border entrant); *Brent v. Ashley*, 247 F.3d 1294, 1302 (11th Cir. 2001) (same).

23-10343        ROSENBAUM, J., Concurring in part            39

In our (now-vacated) panel opinion, we extended "that reasonable-suspicion requirement to searches of prison visitors." *Gilmore*, 111 F.4th at 1131. We explained that, as of that time, nine of our sister circuits had already so held. *See Wood v. Clemons*, 89 F.3d 922, 928–29 (1st Cir. 1996); *Varrone*, 123 F.3d at 79; *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Daugherty v. Campbell*, 935 F.2d 780, 787 (6th Cir. 1991); *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Cates v. Stroud*, 976 F.3d 972, 985 (9th Cir. 2020); *Romo v. Champion*, 46 F.3d 1013, 1020 (10th Cir. 1995). And crucially, by 2017, when Gilmore's search occurred, "seven circuits had required reasonable suspicion for a strip search of a prison visitor." *Gilmore*, 111 F.4th at 1131.

In short, there's no reasonable dispute that a "robust consensus of cases of persuasive authority" clearly established the legal rule Gilmore now seeks to apply. Each of our sister circuits would reach the same conclusion. In fact, many already have. Take the Sixth Circuit. Thirty years ago, it determined that "the law was clearly established" that "the Fourth Amendment required reasonable suspicion before authorizing a body cavity search," as "[t]hree circuits had reached this conclusion" already. *Spear v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995); *see also Varrone*, 123 F.3d at 78–79 (concluding the law clearly established that officers need reasonable suspicion to strip search a prison visitor because "three other circuits had established" such a standard); *Burgess*, 201 F.3d at 945 ("In a long and unbroken series of decisions by our sister circuits . . . it had become well established . . . that strip searches of prison visitors were

40                    ROSENBAUM, J., Concurring in part              23-10343

unconstitutional in the absence of reasonable suspicion that the visitor was carrying contraband.").

So should Gilmore prove that Defendants lacked reasonable suspicion to strip search her, it would not be "unfair to subject" them "to money damages." *Wilson*, 526 U.S. at 618.

Nor do Defendants' arguments that no "robust consensus of cases of persuasive authority" exists here have merit.

First, Defendants suggest that two of the seven pre-2017 cases Gilmore cites cannot provide fair warning to officials because they say the reasonable-suspicion standard those cases announced was dicta. In support of this assertion, Defendants note that the officers in those cases had reasonable suspicion. *See, e.g., Varrone*, 123 F.3d at 79; *Romo*, 46 F.3d at 1020. But Defendants are mistaken that these courts' rulings amount to only dicta.

As I've explained, a governing legal rule is a holding, not dicta, even if it is "technically unnecessary to a case's resolution." *Files*, 63 F.4th at 928; *see Andrew*, 145 S. Ct. at 81. Think again about *Strickland*; we treat *Strickland* as announcing a binding legal rule even though Strickland failed to meet either prong of the Court's test there. *See, e.g., Woodford*, 537 U.S. at 22; *Calhoun*, 92 F.4th at 1347.

And in *Varrone* and *Romo*, the courts had to determine the governing law before they could apply it. That is, to assess whether the defendants' reasonable suspicion in those cases was enough to make their actions constitutional, those courts had to first establish that reasonable suspicion complies with the Fourth Amendment

23-10343          Rosenbaum, J., Concurring in part          41

under the circumstances. So *Varrone* and *Romo* announce a binding legal rule that officers must heed. As a result, it's incorrect to describe their holdings as dicta.

Second, Defendants argue that no consensus exists because the Hawaii Supreme Court purportedly twice upheld strip searches of prison visitors without reasonable suspicion. *See, e.g.*, *State v. Custodio*, 62 Haw. 1 (1980); *State v. Martinez*, 59 Haw. 366 (1978). But no reasonable officer (or officer's attorney) could rely on *Custodio* or *Martinez* to show that the reasonable-suspicion rule Gilmore seeks to apply was not clearly established by 2017. *See Fowler*, 979 F.3d at 78. Both cases relied on the consent of the searched party. *Martinez*, 59 Haw. at 371; *Custodio*, 62 Haw. at 5. So even if *Custodio* and *Martinez* apply here, Defendants could prevail only if they proved at trial that Gilmore consented. But Gilmore has attested that Defendants strip searched her without consent and without reasonable suspicion. *See Lee*, 284 F.3d at 1190 (construing facts in the non-movant's favor at summary judgment).

Third, Defendants argue that no "robust consensus" exists because the decisions that Gilmore relies on predate our decision in *Powell v. Barrett* and the Supreme Court's decision in *Florence v. Board of Chosen Freeholders of County of Burlington*. 541 F.3d 1298 (11th Cir. 2008) (en banc); 566 U.S. 318 (2012). In those cases, we, and then the Supreme Court, upheld a policy of strip searching detainees—without reasonable suspicion—before admitting them to a jail's general population. *Powell*, 541 F.3d at 1300, 1314; *Florence*, 566 U.S. at 339. Defendants suggest a reasonable officer could rely

on those decisions to conclude prison visitors are in a similar position to those entering a jail's general population. And they stress that *Florence* came after the out-of-circuit precedent Gilmore cites. So, they argue, a reasonable official in 2017 could think that those courts would or should re-evaluate their earlier decisions on visitors.

I disagree. To start, no reasonable officer could read *Florence* to undermine the "robust consensus of cases of persuasive authority" requiring reasonable suspicion to strip search a prison visitor. The Supreme Court emphasized that its ruling extended no further than the limited situation before it. Chief Justice Roberts highlighted how "important" it was that the "Court does not foreclose the possibility of an exception to the rule it announces." *Id.* at 340 (Roberts, C.J., concurring). Justice Alito also cautioned that the Court did not bless routine strip searches of arrestees. *Id.* at 341 (Alito, J., concurring). And Justice Breyer added that "[t]he case is limited to strip searches of those arrestees entering a jail's general population." *Id.* at 342 (Breyer, J., dissenting).

But perhaps most importantly, Justice Kennedy, writing the majority opinion, offered two limitations. He first explained that the plaintiff's case there did "not require the Court to rule on the types of searches that would be reasonable in instances where . . . situations may diminish the need to conduct some aspects of the searches at issue." 556 U.S. at 338–39. So the Court refused to extend its ruling to arrestees who may not be entering a jail's general population. *See id.* And given that the Court refused to rule that

23-10343        Rosenbaum, J., Concurring in part        43

jails may always strip search arrestees without reasonable suspicion, it's unreasonable to read *Florence* as abrogating rulings that officers need reasonable suspicion to strip search *visitors*. After all, arrestees are jailed upon at least probable cause to believe they committed a crime. But visitors come into a prison with no legal finding against them.

Besides that, the Court also declined to declare constitutional invasive "searches that involve the touching of detainees." *Id.* at 339. So at a minimum, *Florence* can't control Gilmore's case because Gilmore asserts Defendants manually searched her naked body. *See Gilmore*, 111 F.4th at 1124–25. As our precedent already emphasized by the time the officers searched Gilmore, searches involving physical contact implicate far greater Fourth Amendment concerns than do visual inspections. *See United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018) (citing *United States v. Vega-Barvo*, 729 F.2d 1341, 1345 (11th Cir. 1984)). Defendants were on notice that their alleged conduct violated Gilmore's constitutional rights because the Supreme Court in *Florence* "staked out" the same "bright line" as we previously did. *Post*, 7 F.3d at 1557.

Defendants next argue that some decisions Gilmore cites relied on cases that *Florence* unsettled. This argument reaches for straws. *Florence* abrogated only some decisions that the "robust consensus of cases of persuasive authority" cited in string citations; it didn't abrogate any authority that the "robust consensus" decisions relied on in any material way. *See Blackburn*, 771 F.2d at 565; *Varrone*, 123 F.3d at 79; *Thorne*, 765 F.2d at 1276. Instead, many of

those decisions relied on general Fourth Amendment principles that apply equally to Gilmore's case.

*Blackburn*, for instance, weighed the "official interest in maintaining security against the intrusion entailed by a strip search." 771 F.2d at 564. It explained that "the Constitution normally requires a more particularized level of suspicion before individuals wishing to visit a jail may permissibly be subject to a grossly invasive body search." *Id.* Indeed, it described this conclusion as a "basic . . . constitutional norm." *Id.* And the court highlighted that it could find no "published federal case—other than those involving *incarcerated individuals*—in which a court has approved body cavity searches of individual visitors about whom *no* particular suspicion is harbored." *Id.*

*Florence* did not unsettle these principles; it adheres to them. As the Court explained, the relevant question was "whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband." 566 U.S. at 330. And *Florence* expounded on the risk that detainees posed "for facility staff, for the existing detainee population, and for a new detainee himself or herself." *Id.* The opinion expressly reserved the extension of its decision to other circumstances when the need to conduct invasive searches is "diminish[ed]." *Id.* In short, nothing in *Florence* undermines the logic that led seven (and now nine) of our

23-10343          ROSENBAUM, J., Concurring in part          45

sister circuits to unanimously conclude that prisons may not strip search visitors without reasonable suspicion.

A "robust consensus of cases of persuasive authority" clearly established that prison officials may not strip search a non-consenting visitor in the absence of reasonable suspicion. So a genuine dispute of material fact exists as to whether Defendants violated Gilmore's clearly established constitutional rights.

### IV.    Conclusion

I would answer both the questions that we asked the parties to brief and that they presented on at oral argument. And to respect Supreme Court precedent and bring our precedent into line with every other circuit, I would answer them in the affirmative:

> (1) We should overrule in part *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (en banc), and *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950 (11th Cir. 2003), so that a robust consensus of cases of persuasive authority may clearly establish law for purposes of abrogating an officer's qualified immunity.

> (2) A robust consensus of cases of persuasive authority clearly establishes that Plaintiff-Appellant Clarissa Gilmore's Fourth and Fourteenth Amendment rights were violated.

I respectfully suggest that the Court should have reached these conclusions today.

23-10343            TJOFLAT, J., Concurring            1

TJOFLAT, Circuit Judge, joined by LAGOA and BRASHER, Circuit Judges, and by LUCK, Circuit Judge, as to Parts III, IV, and V, concurring:

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085 (2011). But it does not shield "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986). The line between the two rests on one thing: fair notice.

"[T]he salient question . . . is whether the state of the law" at the time of the violation gave officials "fair warning" that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002). The notice must be clear to "every reasonable official," and it must place the law "beyond debate." *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083 (citation and internal quotation marks omitted).

That fair notice often comes from precedent. But not always. In some cases, the conduct is so extreme and so obviously inconsistent with the Constitution's protections that it provides its own warning. When the constitutional violation is that clear, the conduct itself supplies the notice that qualified immunity demands.

This is such a case.

I agree with the Court that the officers violated Ms. Gilmore's Fourth Amendment rights and are not entitled to qualified immunity. On these facts—taken in the light most favorable to Ms. Gilmore—no reasonable officer would think it lawful to coerce a

civilian into a strip search, manipulate her breasts and buttocks, and inspect her genitals, all without even reasonable suspicion. It was obviously unconstitutional, and that obviousness is enough to defeat qualified immunity.

I write separately to underscore two points.

First, the Court's conclusion that the law was clearly established rests entirely on the obviousness of the constitutional violation. No precedent was necessary to reach that conclusion, and the Court does not rely on any. The facts speak for themselves. The Court cites out-of-circuit cases only to show that the rule here is broadly accepted. But it could have reached the same conclusion without citing a single one. The officers needed no judicial roadmap; the Fourth Amendment already drew the line. *See* U.S. Const. amend. IV (protecting "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures").

Second, I address Judge Rosenbaum's suggestion that a "robust consensus" of nonbinding decisions can clearly establish the law. That is wrong. The Supreme Court has never adopted that view, and it has gone out of its way to avoid saying that even binding circuit precedent is enough. Qualified immunity requires fair notice. A collection of nonbinding decisions—no matter how uniform—cannot place the law "beyond debate." *See al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083.

My concurrence proceeds in four parts.

First, I outline the foundations of qualified immunity and the recognized sources of clearly established law: Supreme Court

23-10343                TJOFLAT, J., Concurring                3

decisions, binding circuit precedent, and in rare cases, the obviousness of the violation itself.

Second, I explain why this case falls into that last category. The officers' conduct was so obviously unlawful that no precedent was needed.

Third, I respond to Judge Rosenbaum's argument that the Supreme Court has required courts to treat persuasive authority as sufficient to clearly establish the law. It has not.

And fourth, I explain why our Circuit is right to reject the "robust consensus" standard. It is vague in theory, messy in practice, and inconsistent with both the fair-notice principle at the heart of qualified immunity and the role of courts of appeals as independent judicial actors.

### I. A Primer on Qualified Immunity

Qualified immunity, as it is known today, has its roots in common law good-faith immunities. In *Pierson v. Ray*, 386 U.S. 547, 87 S. Ct. 1213 (1967), the Supreme Court held that police officers sued under 42 U.S.C. § 1983 could invoke a defense akin to the good-faith and probable-cause immunity available to officers at common law. *Id.* at 555–57, 87 S. Ct. at 1218–19. A few years later, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683 (1974), the Court reaffirmed that public officials should not be held liable for constitutional violations if they acted in good faith and reasonably believed their conduct was lawful. *Id.* at 247–48, 94 S. Ct. at 1692.

The early formulation of qualified immunity contained both subjective and objective components—officials would lose immunity if they knew they were violating clearly established rights (subjective bad faith) or if they acted in a plainly incompetent manner without reasonable grounds (objective unreasonableness). *See Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S. Ct. 992, 1000–01 (1975).

That dual standard did not last. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982), the Court jettisoned the subjective prong and reformulated the test in purely objective terms. To spare courts the burden of probing officials' states of mind, *Harlow* held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S. Ct. at 2738.

*Harlow*'s objective standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096. The focus on "clearly established" law ensures fair notice to officials so that they can conform their conduct to settled legal norms. *See id.* But *Harlow* left open a key question: What counts as "clearly established"? The Court explicitly declined to resolve whether lower-court precedent suffices or whether only Supreme Court decisions qualify. *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738 n.32.

23-10343                TJOFLAT, J., Concurring                5

In the decades since, the Court has refined that standard. Our Circuit has distilled the precedent into three paths for showing that a right was clearly established. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002). I discuss each in turn.

### A. Obvious Violation Without Case Law

First, some conduct is so egregious that any reasonable official would know it violates the Constitution with no precedent required. "[T]he words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." *Id.* at 1350. We have referred to this as the "obvious clarity" case. *Id.* (internal quotation marks omitted).

The Supreme Court illustrated this approach in *Hope v. Pelzer*. There, prison guards twice handcuffed an inmate to a hitching post for hours in the sun. *Hope*, 536 U.S. at 733–35, 122 S. Ct. at 2512–13. The Court found that to be a clearly established violation of the Eighth Amendment because "[t]he obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated Hope's constitutional protection against cruel and unusual punishment. Hope was treated in a way antithetical to human dignity." *Id.* at 745, 122 S. Ct. at 2518.

### B. General Principles That Clearly Apply

When the conduct is not obviously unlawful on its face, courts turn to precedent. Sometimes "some broad statements of principle in case law are not tied to particularized facts and can

clearly establish law applicable in the future to different sets of detailed facts." *Wilson*, 311 F.3d at 1351. That is, a court may hold that "X Conduct" is unconstitutional without confining its holding to a specific factual scenario. *Id.* In such cases, the principle itself may give officials fair warning. *Id.*

Again, *Hope* is instructive. A prior panel of this Court held that no case clearly forbade handcuffing an inmate to a hitching post. *Hope v. Pelzer*, 240 F.3d 975 (11th Cir. 2001), *rev'd*, 536 U.S. 730, 122 S. Ct. 2508 (2002). True, a prior Fifth Circuit case—*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974)—had condemned handcuffing inmates to fences for extended periods. And another case, *Ort v. White*, 813 F.2d 318 (11th Cir. 1987), held that "physical abuse directed at [a] prisoner *after* he terminated his resistance to authority would constitute an actionable [E]ighth [A]mendment violation." *Id.* at 324. Still, even though our panel found that the prison officials violated the Eighth Amendment, it found that the right was not clearly established because neither *Gates* nor *Ort* involved a hitching post. *Hope*, 240 F.3d at 981–82.

The Supreme Court rejected that hair-splitting. *Hope*, 536 U.S. at 742–43, 122 S. Ct. at 2516–17. It found that the broader principles from our precedent "put a reasonable officer on notice that the use of the hitching post under [these] circumstances . . . was unlawful." *Id.* at 745–46, 122 S. Ct. at 2518. The Court went further and said, "[t]he fair and clear warning that [*Ort* and *Gates*] provided was sufficient to preclude the defense of qualified immunity at the

23-10343                 TJOFLAT, J., Concurring                 7

summary judgment stage." *Id.* at 746, 122 S. Ct. at 2518 (citation and internal quotation marks omitted).

### C. Case Law With Indistinguishable Facts

Finally, the most conventional route: binding precedent with materially similar facts. *Wilson*, 311 F.3d at 1351–52. "That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances.'" *Id.*

This is the narrowest of the three paths. It requires near congruence between the precedent and the case at hand. *Id.* at 1351–52. If such a precedent exists, the law is clearly established, and qualified immunity falls. *Id.* The "contours [of the right] must be sufficiently clear," *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515, and the facts of both cases must be "materially similar," *Wilson*, 311 F.3d at 1352.

## II. Gilmore's Case

Some constitutional violations fall in gray areas. The search here does not.

Ms. Gilmore was a civilian visiting her husband at a state jail. Before entering the visitation room, she passed through an initial security screening that involved (1) a pat-down, (2) a metal detector wand search, and (3) an electromagnetic radiation body-scan search. No alarm sounded. No contraband was found. And no correctional officer thought anything was suspicious. Officers then escorted Ms. Gilmore to a second building containing the visitation

room. After Ms. Gilmore spent about 30 minutes in the visitation room with her husband, officers removed her and took her to an empty bathroom. They did not tell her why. An officer then handed Ms. Gilmore a blank strip-search approval form and told her to sign or else she would go to jail and be unable to visit her husband. The officers even told Ms. Gilmore that if she did not sign the form they would "search [her] anyway."

And search her they did. Officers ordered Ms. Gilmore to disrobe entirely. One officer lifted Ms. Gilmore's breasts. Another touched between her buttocks. Ms. Gilmore was commanded to spread her vagina for inspection. No probable cause justified this intrusion. No reasonable suspicion supported it. No option to decline existed. Ms. Gilmore's acquiescence to the search was procured by threat. And the scope of the search was exorbitant.

No reasonable officer could think this conduct was lawful. The Fourth Amendment's protection against unreasonable searches is neither arcane nor obscure. At its core lies a principle that the State may not invade the body of a presumptively innocent person without justification. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated."). Regardless of whether that justification needed to be probable cause or reasonable suspicion, that principle was obliterated here.

The Court rightly concludes that this is an "obvious clarity" case. The facts speak for themselves. The coercive, suspicionless nature of this strip search, coupled with its deeply invasive execution,

23-10343　　　　　TJOFLAT, J., Concurring　　　　　9

rendered it plainly unconstitutional. No reasonable officer could have believed otherwise. And no precedent was needed to say so.

The Court also cites several out-of-circuit decisions involving similar conduct to confirm that the constitutional principles at issue are well established. Those citations should not be understood as necessary—or even as a contributing factor—to the conclusion reached here. This is not a case that depends on precedent to supply fair notice. The officers' conduct was so extreme, so lacking in justification, and so invasive of personal dignity that it fell outside the bounds of any reasonable understanding of lawful authority. The violation was obvious. That alone is sufficient to defeat qualified immunity. The presence of reinforcing authority may lend confirmation, but it plays no role in the fair notice inquiry that compels today's result.

### III. The So-Called "Robust Consensus" Standard

In her concurring opinion, Judge Rosenbaum asserts that the Supreme Court requires our Circuit to recognize that a "robust consensus of cases of persuasive authority" can clearly establish the law. *See* Rosenbaum Concurrence at 1. That is wrong.

She relies on six Supreme Court cases which, in her view, hold that such a consensus can suffice. They do not. I address each in turn.

One thing to keep in mind when reading this analysis is that the lodestar of qualified immunity is notice. Notice is qualified immunity's first principle. And the kind of notice that defeats immunity is legal, not judicial. Courts must ask not whether they could

reason their way to a conclusion of unconstitutionality, but whether the official had clear and fair warning before the fact.

This is the core distinction that much of the "robust consensus" debate overlooks. *Courts* can resolve legal ambiguity; *officers* cannot. Judges are trained to parse legal distinctions, synthesize precedent, and reconcile seemingly conflicting lines of authority. Officers are not. They are expected to know what the law clearly forbids, not to anticipate how appellate courts will later interpret contested rules. That is impossible with the so-called "robust consensus" standard. *Cf. Brown v. Giles*, 95 F.4th 436, 439 n.1 (6th Cir. 2024) (Thapar, J.) ("Police officers protect the public in uncertain, dangerous, and rapidly evolving situations—not in the cold crucible of the courtroom. Asking [officers] to divine 'clearly established' law from [a] smattering of [nonbinding] cases . . . would demand more than the Supreme Court requires.").

As the Supreme Court has put it, clearly established law must place the right "beyond debate." *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083.

## A. Wilson v. Layne

In *Wilson v. Layne*, federal marshals brought reporters into a home during an arrest as part of a police ride-along program. 526 U.S. 603, 605, 119 S. Ct. 1692, 1695 (1999). The Court held that doing so violated the Fourth Amendment—but still granted qualified immunity because the law was not clearly established. *Id.* at 605–06, 119 S. Ct. at 1695. Why? Because "[t]he constitutional question presented by this case is by no means open and shut," *id.* at 615, 119

S. Ct. at 1700, and "the state of the law . . . was at best undeveloped," *id.* at 617, 119 S. Ct. at 1701. The Court concluded that the officers "[could ]not have been expected to predict the future course of constitutional law." *Id.* (citations and internal quotation marks omitted).

> The Rosenbaum Concurrence seizes on this sentence:

> Petitioners have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.

*Id.* at 617, 119 S. Ct. at 1700. But this language does not endorse a path to clearly establishing law through nonbinding circuit decisions. The Court cited the *absence* of controlling authority and the division among persuasive authorities to explain why the rule was not clearly established. The fractured state of the relevant Fourth Amendment law was the very reason immunity applied.

The Court's broader point confirms this reading: even the judiciary was divided on whether media ride-alongs violated the Fourth Amendment. The Court went out of it way to highlight that "[b]etween the time of the events of this case and today's decision, a split among the Federal Circuits in fact developed on the question whether media ride-alongs that enter homes subject the police to money damages." *Id.* at 618, 119 S. Ct. at 1701 (citations

omitted). And the Court emphasized that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Id.*

## B. Ashcroft v. al-Kidd

In *Ashcroft v. al-Kidd*, the Supreme Court considered whether former Attorney General Ashcroft was entitled to qualified immunity for his alleged role in the detention of Abdullah al-Kidd under the federal material witness statute. 563 U.S. at 734, 131 S. Ct. at 2080. The Court held that Ashcroft was entitled to qualified immunity because there was "no Fourth Amendment violation," and even if there was, it was not clearly established. *Id.* at 740–41, 131 S. Ct. 2083.

On the second point, the Court was unequivocal: "At the time of al-Kidd's arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional." *Id.* at 741, 131 S. Ct. at 2083. The best the plaintiff could muster was a stray line in a district court footnote, unsupported by citation, which the Court dismissed as insufficient and as "an extraordinary proposition." *Id.* at 741, 131 S. Ct. at 2083–84.

The Court ridiculed the idea that such a comment, which "boldly call[ed] [Ashcroft] out by name," could amount to clearly established law. *Id.* at 741, 131 S. Ct. at 2084 (internal quotation marks omitted). It explained that "even a district judge's *ipse dixit* of a holding is not 'controlling authority' in any jurisdiction," much less the entire United States. *Id.* And it pointedly added: "his *ipse*

*dixit* of a footnoted dictum falls far short of what is necessary absent controlling authority: a robust 'consensus of cases of persuasive authority.'" *Id.* at 741–42, 131 S. Ct. at 2084 (quoting *Wilson*, 526 U.S. at 617, 119 S. Ct. at 1700).

The Rosenbaum Concurrence takes that phrase as a doctrinal test. It is not. The Court used it descriptively—to underscore how far the plaintiff's argument fell short. The point was not that a consensus of out-of-circuit decisions would have sufficed, but that the plaintiff had not even come close to meeting any standard. So, like *Wilson*, the law was too unsettled for officers to have known the right answer—particularly when courts themselves did not.

## C. Plumhoff v. Rickard

In *Plumhoff v. Rickard*, the Supreme Court determined that police officers who shot the driver of a fleeing vehicle and ended a dangerous car chase were entitled to qualified immunity. 572 U.S. 765, 768, 134 S. Ct. 2012, 2016–17 (2014). The Court found that "the officers did not violate the Fourth Amendment" and "[i]n the alternative," the law was not clearly established. *Id.* at 768, 134 S. Ct. at 2017.

Writing for the Court, Justice Alito said:

[I]t was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger. . . . To defeat immunity here, then, respondent must show at a minimum either (1) that the officers' conduct in this case was materially different from the conduct in *Brosseau* or (2)

14                    TJOFLAT, J., Concurring                    23-10343

that between February 21, 1999, and July 18, 2004, there emerged either "'controlling authority'" or a "robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at 2084 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L.Ed.2d 818 (1999); some internal quotation marks omitted), that would alter our analysis of the qualified immunity question. Respondent has made neither showing.

*Id.* at 779, 134 S. Ct. at 2023.

But again, the Court was not crafting a standalone rule. It was quoting *al-Kidd* and *Wilson*—where the absence of consensus confirmed the lack of clearly established law. *Plumhoff* restates the same point: when the legal terrain is unsettled, qualified immunity applies.

### D.  City and County of San Francisco v. Sheehan

In *City and County of San Francisco v. Sheehan*, the Court addressed whether officers were entitled to qualified immunity after pepper-spraying and shooting a mentally ill woman. 575 U.S. 600, 602–06, 135 S. Ct. 1765, 1769–71 (2015). The Court found that the law was not clearly established. *Id.* at 613, 135 S. Ct. at 1775.

Like the other cases, the Court based its holding on the lack of case law. First, it noted that "nothing in our [Supreme Court] cases suggests the constitutional rule applied by the Ninth Circuit." *Id.* Second, it explained that the Ninth Circuit's precedential cases were too factually dissimilar to put the matter beyond debate. *Id.* at 614–16, 135 S. Ct. at 1776–77.

23-10343                TJOFLAT, J., Concurring                15

Then came this statement: *"to the extent that* a 'robust consensus of cases of persuasive authority' could itself clearly establish the federal right respondent alleges, no such consensus exists here." *Id.* at 617, 135 S. Ct. at 1778 (internal citation omitted) (emphasis added).

Those qualifying phrases—"to the extent that" and "could itself"—are dispositive. It signals that the Court did not adopt, and was not relying on, a consensus-based rule. Rather, it expressly left the question open. And what it did say was clear: even assuming such a rule could exist, there was no consensus here. That forecloses the idea that *Sheehan* somehow ratified a consensus standard. It did not. It dodged deciding the issue.

### E.  District of Columbia v. Wesby

In *District of Columbia v. Wesby*, the Supreme Court held that officers who arrested partygoers inside a vacant home were entitled to qualified immunity. 583 U.S. 48, 65, 138 S. Ct. 577, 591 (2018). After concluding that the officers had probable cause, the Court exercised its discretion to address the "clearly established" prong and squarely rejected the argument that any precedent had given officers fair notice that their conduct was unconstitutional. *Id.* at 62, 64, 138 S. Ct. at 589, 590. The Court wrote:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'"

*Id.* at 63, 138 S. Ct. at 589–90 (citations internal quotation marks omitted).

But, again, the Court was not adopting a new standard. It was describing the kind of legal clarity that *might* equate to settled law. And the Court included a disclaimer:

> We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 665–66, 132 S. Ct. 2088, 2094 (2012) (reserving the question whether court of appeals decisions can be "a dispositive source of clearly established law"). We express no view on that question here.

*Id.* at 66, 138 S. Ct. at 591 n.8. This footnote cuts against the reading that the Rosenbaum Concurrence offers. Far from mandating that non-binding circuit decisions could clearly establish the law, *Wesby* expressly declined to reach whether *any* circuit decisions were sufficient.

Judge Rosenbaum resists this point by leaning on *Wesby*'s phrasing: that clearly established law must be "dictated by controlling authority *or* a robust consensus of cases of persuasive authority." *Id.* at 63, 138 S. Ct. at 589–90 (emphasis added). From that disjunctive phrasing, she infers that "persuasive authority" alone—which she defines as nonbinding, out-of-circuit precedent—can be enough to clearly establish the law. But that inference extends beyond anything the Court has ever endorsed.

23-10343            TJOFLAT, J., Concurring            17

To the Supreme Court, everything outside its own precedent—including our published decisions—is merely persuasive. *See, e.g.*, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 472, 128 S. Ct. 1951, 1970 (2008) (Thomas, J., dissenting) ("Unlike decisions of this Court, decisions of the courts of appeals, even when unanimous, do not carry *stare decisis* weight."). In other words, the boundary between "binding" and "persuasive" authority looks very different from the Supreme Court's perch than from ours. When the Supreme Court refers to persuasive authority, it may well mean binding circuit precedent—what we already recognize as sufficient. Or it may refer to decisions from district courts, state courts, or other circuits. Judge Rosenbaum offers no reason to think the Court intended to place those nonbinding sources on equal footing with binding circuit precedent.

Until the Supreme Court clarifies what qualifies as persuasive authority and how it fits into the analysis, we should not treat "robust consensus" as a rule of decision. The Court has invoked the phrase only to confirm that the law was *not* clearly established. That context speaks for itself.

### F.  Summary

The cases the Rosenbaum Concurrence invokes share a theme: each uses "robust consensus" language not to impose a rule, but to illustrate the absence of one. The Supreme Court has

18                    TJOFLAT, J., Concurring                    23-10343

never held that persuasive precedent can clearly establish the law.[1] But it has repeatedly said that a lack of consensus can preclude such a finding.

That is no accident. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096. It demands that a legal rule be so clearly settled that "every reasonable official" would understand it. *Mullenix v. Luna*, 577 U.S. 7, 11–12, 136 S. Ct. 305, 308 (2015) (citation omitted). Persuasive authority may signal uncertainty, shielding an officer from liability. But the Supreme Court has never used it to strip immunity away. *See also City of Escondido v. Emmons*, 586 U.S. 38, 42–43, 139 S. Ct. 500, 503 (2019) (per curiam) (reserving the question of what precedent can clearly establish the law); *Rivas-*

---

[1] Judge Rosenbaum cites the Supreme Court's recent decision in *Andrew v. White*, 145 S. Ct. 75 (2025), for the proposition that: "[T]he [Supreme] Court has unambiguously told us that when it uses 'a legal rule or principle to decide a case, that principle is a 'holding' of the Court.'" Rosenbaum Concurrence at 15 (quoting *Andrew*, 145 S. Ct. at 81). But that is not what the Court said. The actual language is this:

> When this Court relies on a legal rule or principle to decide a case, that principle is a "holding" of the Court *for purposes of the AEDPA*.

*Andrew*, 145 S. Ct. at 81 (citation omitted) (emphasis added). Judge Rosenbaum omits the limiting clause. But that clause confines the statement to habeas review. The Supreme Court does not include such qualifiers by accident, and we are not free to ignore them. *Contra* Rosenbaum Concurrence at 13 n.3.

23-10343              TJOFLAT, J., Concurring                    19

*Villegas v. Cortesluna*, 595 U.S. 1, 5, 6, 142 S. Ct. 4, 7, 8 (2021) (per curiam) (same).

The Supreme Court's consistent hesitation to endorse even binding circuit precedent as sufficient evidences the flaw in the Rosenbaum Concurrence's theory: If the Court has repeatedly declined to say whether binding circuit precedent is sufficient, it certainly has not said that non-binding circuit decisions, standing alone, are sufficient. Indeed, the Supreme Court has *never* held that persuasive precedent can clearly establish the law. Rather, the Court has only ever used persuasive precedent to illustrate that the law was *not* clearly established.

All told, the cases paint a consistent picture: persuasive authority can inform the analysis, but it cannot resolve it. *See also, e.g.*, *Reichle*, 566 U.S. at 666, 669–70, 132 S. Ct. at 2095, 2096 ("Decisions from other Federal Courts of Appeals [support that the right was *not* clearly established]."); *Stanton v. Sims*, 571 U.S. 3, 6, 10–11, 134 S. Ct. 3, 6–7, 10 (2013) (per curiam) (reversing the Ninth Circuit's decision that a right was clearly established partly because "federal and state courts nationwide [we]re sharply divided on the question"); *Pearson v. Callahan*, 555 U.S. 223, 244–45, 129 S. Ct. 808, 822–23 (2009) (reversing the Tenth Circuit's decision that a right was clearly established because other courts of appeals ruled to the contrary and so it was not clearly established). Every time the Supreme Court has used a "robust consensus of persuasive authority," it has done so descriptively, not prescriptively, and always in the negative.

And if there were any doubt, the Court's own language dispels it. In case after case, the Supreme Court has made clear that it has not yet decided whether even binding circuit precedent qualifies as controlling authority for purposes of qualified immunity. Yet the Rosenbaum Concurrence reads those same opinions as though the issue had already been resolved—and resolved in its favor.

That reading cannot be squared with the Court's own words. The Supreme Court has reserved the question repeatedly and expressly. And until it decides otherwise, lower courts are not bound to treat persuasive authority as a sufficient basis for denying qualified immunity.

## IV. The "Robust Consensus" Standard in the Eleventh Circuit

Having concluded that the Supreme Court has not mandated that we treat a "robust consensus" of out-of-circuit cases as controlling, the question remains whether we should adopt that standard in the Eleventh Circuit. We should not.

### A. Ambiguity

The first problem with the so-called "robust consensus" standard is simple: nobody knows what it means. Not even the Rosenbaum Concurrence, which advocates for the phrase, can define it. Many seem to assume it refers to agreement across geographic circuits. But the phrase—*"robust consensus of persuasive authority"*—does not say that. It speaks of quantity and persuasion, not geography.

So what counts? Fifteen opinions all from the Fifth Circuit, all pointing in the same direction—robust or not? They are surely persuasive, and plenty in number. But apparently not the *right* number, from the *right* places. If we do limit it to a "robust consensus of federal circuit court decisions from *different* circuits," how many make a consensus "robust"? Three? Four? Must the decisions be published? Must they be unanimous? Must they rely on the same reasoning? What if some contain hedged language, contrary dicta, or vigorous dissents?

No one applying this standard has given consistent answers. Yet we are told this vague phrase can produce clearly established law—law that governs whether public officials are personally liable for money damages. All of this in the face of the Supreme Court's insistence that clearly established law be "beyond debate." *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. It is hard to see how a phrase that even learned judges cannot coherently define establishes a framework ensuring fair notice to officials on the ground—let alone the kind of unmistakable clarity that satisfies the "beyond debate" standard.

Judge Rosenbaum insists that the ambiguity in the "robust consensus" standard is insignificant because some of our sister circuits have tried to define the phrase. *See* Rosenbaum Concurrence at 25–28. But that claim falters, both in premise and in practice.

Start with the premise. The Supreme Court has never defined what constitutes a "robust consensus of persuasive authority." I do not understand Judge Rosenbaum to dispute that. As

discussed above, what counts as binding or persuasive authority differs dramatically depending on the court. For the Supreme Court, persuasive authority might include our published opinions. For circuit courts, those same opinions are binding. So when sister circuits invoke the "robust consensus" formulation, they are not applying a standard set by the Supreme Court—they are creating one of their own.

That lack of Supreme Court guidance has produced confusion in application: our sister circuits have not agreed on what the standard means. The only consensus is that there is no consensus. Some circuits count three aligned decisions as enough; others require six or more. Some consider district court or state court opinions; others exclude them. Some allow unpublished decisions; others reject them. Far from reflecting uniformity, the circuits' scattered methods underscore how vague and unreliable the "robust consensus" standard has become.

That uncertainty has real consequences. It undermines qualified immunity's core function: giving officials fair notice of what the law prohibits. *See Wilson*, 526 U.S. at 618, 119 S. Ct. at 1701 ("If judges thus disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy.").

## B. Structure

Even if a "robust consensus" could somehow be consistently defined, it would still be incompatible with the structure of the federal judiciary.

The federal courts of appeals are not a single, nationwide panel that drafts opinions by committee and votes by circuit-wide rollcall. They are independent, coequal courts, each vested with authority over its own geographic jurisdiction and charged with saying what the law is for the citizens within it. As we have explained:

> By design the federal court system allows courts to reach multiple answers to the same legal question. . . . There are 94 federal district courts around the country and 12 regional circuit courts of appeals. The decision of any one of those courts typically has little effect on the other courts of its type: one circuit's decisions are not binding on the others.

*Georgia v. President of the United States*, 46 F.4th 1283, 1304 (11th Cir. 2022).

In the Eleventh Circuit, only this Court, the Supreme Court, and the relevant state supreme courts have the power to clearly establish law. Other circuits have no power to do so. *See id.* at 1304 (citation omitted).

The so-called "robust consensus" standard ignores this structure. The standard instructs officials in our jurisdiction to heed decisions from courts with no authority over them. Worse still, it tells us that if enough circuits agree on an issue—though we cannot say how many or in what form—officials in our Circuit must treat their agreement as effectively binding. That turns our Court into a spectator—our judgment displaced by a headcount of out-of-circuit

panels. Qualified immunity, in turn, becomes not a doctrine of fair notice, but a tally of judicial votes from other circuits.

But our job is not to count heads. Our duty is to get the law right—even when others disagree. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403, 144 S. Ct. 2244, 2267 (2024) ("[T]here is little value in imposing a uniform interpretation of a statute if that interpretation is wrong."); *see also Georgia*, 46 F.4th at 1304 ("Differing opinions aid the development of important questions of law." (citation and internal quotation marks omitted)). Consensus does not relieve us of the responsibility to exercise independent judgment.

Some may respond that the "robust consensus" standard is not deference on the merits—it is only about whether notice existed that a law was clearly established. But that distinction cannot bear weight. If the other Circuits say that conduct violates the law, then either the conduct does or it does not. Circuit splits exist for a reason: judges disagree. *See Georgia*, 46 F.4th at 1304 ("Conflicts [between circuits] are inevitable."); *see also Mullenix*, 577 U.S. at 17, 136 S. Ct. at 312 (finding that the Fifth Circuit's holding of whether a law was clearly established conflicted with a case from our Circuit). If our Circuit holds that some conduct was lawful in the face the disagreement of other courts of appeals, it makes no sense to say the law was "clearly established" to the contrary.

Qualified immunity demands notice, not numerosity. And Article III demands independence, not conformity. We should decline to adopt a rule that undermines both.

Judge Rosenbaum responds by reframing my concern: that I object to a "robust consensus standard" because it "would force us to impose liability even if we think officials' conduct is lawful or when other circuits disagree with us." Rosenbaum Concurrence at 30 n.7. But that misstates my argument. I have not claimed that the standard forces us to impose liability despite our own views. My objection is more basic: the so-called standard severs "clearly established" law from what the law actually is.

Consider this hypothetical: six circuits hold that a particular type of conduct is unconstitutional. We have not yet addressed the issue. Under Judge Rosenbaum's view, that consensus would clearly establish the law in this Circuit. *See id.* at 28–30 (suggesting that agreement among just three circuits should amount to a "robust consensus" sufficient to clearly establish the law). But suppose we later confront the issue and hold that the conduct was lawful all along. Her approach would treat the law as "clearly established" before we had spoken—only for us to then declare that no violation ever occurred. That makes no sense. *See al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083 ("[C]learly established" means that "existing precedent must have placed the statutory or constitutional question beyond debate" (citations omitted)).

Judge Rosenbaum resists this point by saying the logic "proves too much." Rosenbaum Concurrence at 32. She argues that it "would require us to overturn our current precedent that decisions of the relevant state supreme court can clearly establish the law," because "[t]hose decisions don't bind us when it comes to

federal questions." *Id.* at 32–33. But that misunderstands both our precedent and how the notice inquiry works.

A state supreme court's interpretation of federal law may not bind us, but it *does* bind the state officials who are subject to the court's authority. Those officials must conform their conduct to that court's rulings or risk liability in their own state courts. That is what makes such decisions a legitimate source of notice—because they carry legal consequence.

Judge Rosenbaum does not dispute that state officials are bound by their own supreme courts. Rather, she notes that a state supreme court's interpretation of federal law does not bind federal courts in a § 1983 action. *Id.* at 33–35. That is correct—but beside the point. Again, the question is not whether state court decisions bind us; it is whether they bind the state officials subject to that court's authority. And they do. State officials are unquestionably governed by their own state's highest court. When that court announces a rule, those officials must conform their conduct to it or face consequences—whether through state tort liability, administrative discipline, or evidentiary exclusion in criminal proceedings, among other things. That binding law provides exactly what qualified immunity requires: fair notice that the conduct is, in fact, unlawful.

By contrast, out-of-circuit precedent creates no such obligations. It binds no one in this Circuit—not officers, not District Courts, and not this Court. Treating decisions from other circuits as if they bore the same weight as binding law collapses the

23-10343                TJOFLAT, J., Concurring                27

distinction between guidance and command. But fair notice demands more than persuasive reasoning; it requires a source of law that governs the official's conduct. And decisions from other circuits, however thoughtful, do not qualify.

The same confusion underlies Judge Rosenbaum's analogy to panel opinions. She suggests that, under this logic, panel opinions cannot clearly establish the law either, since they may later be overturned en banc. *See id.* at 36–37. But that argument also misses the point. A published panel decision is binding when issued. *See Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992). It governs the conduct of officials in this Circuit unless and until we say otherwise. *See, e.g., id.* That is what qualified immunity requires. The notice inquiry is backward-looking: it asks whether the law was clearly established *when the official acted*. *See al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. Officers are not expected to anticipate future reversals. They are expected to follow the law in effect at the time.

That is the distinction Judge Rosenbaum overlooks. Panel decisions and state supreme court rulings provide fair notice to officials because they carry legal force at the time of the conduct. Out-of-circuit precedent carry none. The former create obligations; the latter do not. Qualified immunity does not ask whether an officer could have guessed that a panel of judges elsewhere would disapprove of his conduct. It asks whether any authority with jurisdiction over him already said it was unlawful.

In the end, qualified immunity turns on two questions: whether a legal violation occurred and whether the law clearly

established it. The "robust consensus" standard allows the second to be satisfied even when the first is not. That disconnect puts officials in an impossible position. They must choose between following binding law as it exists or insulating themselves by conforming to nonbinding decisions we may ultimately reject. That is not fair notice. It is guesswork. And it turns qualified immunity from a shield into a gamble.

### C.  Application

Even assuming, arguendo, that a "robust consensus of persuasive authority" could suffice to clearly establish the law—a proposition neither the Supreme Court nor this Circuit has endorsed—such a standard would not alter the outcome of *this* case. The Rosenbaum Concurrence asserts that, had we recognized such a theory today, the officers' conduct would have violated clearly established law under the "robust consensus" standard. *See* Rosenbaum Concurrence at 3, 45 (answering in the affirmative whether "a robust consensus of cases of persuasive authority clearly establish[ed] that Plaintiff-Appellant Clarissa Gilmore's Fourth and Fourteenth Amendment rights were violated"). That contention cannot be correct.

The relevant inquiry for qualified immunity is not what the law says today, nor what a court might wish it had said, but whether the legal rule was clearly established at the time the challenged conduct occurred. *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. Time and again the Supreme Court has made clear that the analysis "must be assessed in light of the legal rules that were clearly established at

the time [the action] was taken." *Ziglar v. Abbasi*, 582 U.S. 120, 151, 137 S. Ct. 1843, 1866 (2017) (citation and internal quotation marks omitted).

Here, no party disputes that the conduct occurred while *Thomas* and *Marsh* were binding. And both decisions expressly reject that a consensus of persuasive authority—no matter how robust—could clearly establish law in this Circuit. So even if this Court were to adopt the "robust consensus" standard today, no such doctrinal shift can retroactively strip officials of the immunity they possessed under then-existing law.

To hold otherwise would defy the most basic premise of qualified immunity: that officials are entitled to fair notice before they can be held personally liable. *See* Nathan S. Chapman, *Fair Notice, the Rule of Law, and Reforming Qualified Immunity*, 75 Fla. L. Rev. 1, 6 n.18 (2023) (collecting Supreme Court cases emphasizing the fair notice rationale). A legal standard announced today cannot supply the clarity required to strip immunity from officials who acted yesterday.

## V. Conclusion

Qualified immunity turns on fair notice. And here, the officers had all the notice they needed. The conduct itself—without more—put the constitutional line "beyond debate." *See al-Kidd*, 563 U.S. at 741. No precedent was necessary.

Judge Rosenbaum suggests that the notice could have instead come from a robust consensus of nonbinding authority. That is wrong. Qualified immunity is not a numbers game. A smattering

of nonbinding decisions, however aligned, cannot place the law "beyond debate." *See id.* They may confirm what is already obviously unconstitutional, but they cannot make it so.